Filed 4/3/19 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B280998<br>(Super. Ct. No. 1435502)<br>(Santa Barbara County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>    Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT\*:

It is ordered that the opinion filed herein on March 11, 2019, be modified as follows:

1.  On page 15, lines 1-2, the first sentence is changed to read:
    Here the reenactment occurred at M.S.'s apartment with the knowledge and presence of her parents who were outside the apartment.

There is no change in judgment.

Appellant's petition for rehearing is denied.

---

\* Gilbert, P.J., Yegan, J., Tangeman, J.

Filed 3/11/19 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B280998<br>(Super. Ct. No. 1435502)<br>(Santa Barbara County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>    Defendant and Appellant. | |

     M.S. appeals an order of the juvenile court sustaining the allegations of a Welfare and Institutions Code section 602 petition and declaring her a ward of the court.  Among other conclusions, we decide that sufficient evidence exists that M.S. committed second degree murder.  (Pen. Code, §§ 187, subd. (a), 189, 12022, subd. (b)(1) [personal use of deadly weapon (knife)].)[1]

---

     [1] All statutory references are to the Penal Code unless stated otherwise.

Is M.S. eligible to be considered for referral to a mental health diversion program pursuant to the newly enacted sections 1001.35 and 1001.36?  No.  The new mental health diversion law does not apply to juveniles.  Even if it did, M.S.'s crime, murder, is excluded.  We affirm.

This appeal concerns the tragic death of Baby Boy A. following his home birth to then 15-year-old M.S.  Frightened that her parents would learn that she had been pregnant and given birth, M.S. inflicted fatal cuts on A.'s throat, severing his carotid artery and trachea.  M.S. thereafter placed his body in a plastic bag and concealed the bag in the bathroom vanity.  During police questionings, M.S. initially asserted that the infant was born stillborn but then stated that she accidentally wounded him when she cut the umbilical cord.  When confronted with the medical examiner's findings, however, M.S. finally admitted that she used a kitchen knife to cut the infant's throat.  On appeal, M.S. challenges the juvenile court's finding of malice, as well as the court's Fourth and Fifth Amendment evidentiary rulings, among other issues.

*FACTUAL AND PROCEDURAL HISTORY*

In the morning of January 17, 2016, 15-year-old M.S., her parents, and her siblings appeared at the Marian Medical Center in Santa Maria.  M.S. complained of abdominal pain and vaginal bleeding.  An examination by physician's assistant Ashley Bridges revealed an umbilical cord protruding from M.S.'s vagina.  M.S. complained that she had been suffering pain and bleeding since the early morning.  When she sat on the toilet, she felt the urge "to push."  As she did, she felt "a ripping sensation" and a baby emerged.  M.S. stated that the baby was not breathing and had no heartbeat.

2

At Bridges's request, M.S. held a private conversation with her (M.S.'s) mother. M.S.'s father then returned to the family's apartment to retrieve the baby's body. He returned to the hospital shortly thereafter with the trash bag from the apartment bathroom. Hospital personnel examined the contents of the trash bag but did not find the infant's body.

M.S. informed Bridges that her brother had taken the plastic bag containing the infant's body and disposed of it. In the presence of his mother, Bridges spoke with M.S.'s brother. He stated that while M.S. was in the bathroom, she asked him to retrieve scissors and a bag. He could not locate scissors, however, and therefore brought her a kitchen knife and a bag. He denied disposing of the bag thereafter.

Bridges then spoke with M.S. again and asked her purposes for scissors or a knife. M.S. responded that she used the knife to cut her clothing. Bridges asked M.S. if she used the knife to cut the umbilical cord. M.S. denied using the knife for that purpose and explained that she pulled the cord to detach it. Bridges continued to question M.S. to determine the whereabouts of the infant's body. M.S. replied that she may or may not have seen the body and may have flushed it in the toilet. M.S. also denied knowing that she was pregnant. Hospital personnel summoned police officers.

That afternoon, Santa Maria Police Detectives Andrew Brice and Michael McGehee were informed that a woman had given birth and that the infant was missing or dead. After speaking to the hospital nursing staff, the officers visited M.S.'s hospital room, the door to which was open. The detectives spoke with M.S. in a recorded interview; they had "open mind[s]" and were considering "all possibilities," including "a medical event."

3

The detectives wore business suits and, at the time of the interview, a nurse was present.  During the interview, M.S. recounted "four different versions" of the birth, before stating that the infant's body was in a plastic bag in the bathroom vanity.  M.S. stated that the infant was stillborn and she may have accidentally inflicted injuries on him while cutting the umbilical cord.  The officers requested permission to search the family's apartment and M.S. consented.

Criminalist technician Crystal Krausse arrived at the hospital to take photographs of M.S., including photographs of her abdomen that revealed two discolored areas.  M.S. did not object to the photographs and cooperated in moving her clothing aside.  The photographs were taken as M.S. lay in bed and she was not requested to disrobe.

Meanwhile, other Santa Maria police officers had visited the apartment to see if the infant was alive and, if so, to render aid.  M.S.'s father gave the officers permission to enter the apartment and signed a consent-to-search form.  When an officer thought he saw the body of a baby inside a clear trash bag in the bathroom, he "clos[ed] down the scene" to seek a search warrant.  When Detective Brice arrived at the apartment later, he confirmed with M.S.'s father that he consented to a search of his apartment.  This conversation was recorded.

Lydia Magdaleno, a criminalist technician for the Santa Maria Crime Lab, visited the apartment in the early evening to take photographs.  She discovered a plastic bag containing bloody tissues in the bathroom.  On a maroon-colored trash can in the bathroom, Magdaleno saw blood drops and dribbles.  She looked inside the bathroom vanity, behind shoes that were stored there.  She found a plastic bag that appeared to contain an infant's body.

4

Magdaleno removed the bag, partially opened it to inspect its contents, and reported her findings to officers.

Meanwhile, Brice returned to the hospital to request consent from M.S. to search a cellular telephone that he found in the family's apartment. M.S. agreed to a search of the telephone as well as her school laptop computer. She signed a consent-to-search form after Brice reviewed the form with her. M.S. then provided her telephone's password to Brice.

Santa Barbara Sheriff's Deputy Chad Biedlinger was dispatched by the coroner's office to the apartment. He removed the plastic bag containing the infant's body and placed it on a body bag on the bed. Biedlinger briefly examined and took photographs of the infant's body. He then placed the body inside the body bag and took it to the coroner's office.

Detective McGehee later found a straight-edged broccoli knife among articles of clothing in the bathroom. Bloodstains were on the knife handle and blade. A search of the apartment pursuant to a search warrant revealed luminol-activated blood drops on the walls and floor of the bathroom.

On January 19, 2016, Doctor Manuel Montez, the Santa Barbara County forensic pathologist, performed an autopsy on the infant. Montez estimated that the infant was 34 or 35 weeks old and viable at the time of his death. The infant had a seven centimeter cut across his neck that extended four millimeters into his spine, severing his carotid artery and trachea and depleting his blood volume. Montez also opined that the infant had "hesitation marks" across his torso. He concluded that the fatal neck wound may have been caused by two or three strikes. Based upon the hemorrhage at the site of injury and the infant's aerated lungs, Montez opined that the infant was alive at the

5

time he was fatally wounded.  When shown a photograph of the knife recovered in the bathroom, Montez opined that the infant's mortal injuries could have been caused by that knife.  Montez also observed that the umbilical cord had been cleanly cut.  Given the nature of the wound, Montez opined that the crime scene would have been bloody, possibly with a spray or mist of blood in the room.

*January 20, 2016, Recorded Video Reenactment*

At the time police officers served a search warrant for a search of the family's apartment, they requested that M.S. reenact the occurrences that led to the infant's death.  The request was made in the presence of M.S.'s parents.  McGehee informed M.S. that she was "not in any trouble right now," was "free to leave," and did not have to participate.  M.S. agreed to participate and used a toy doll to reenact the birth.  During the reenactment, she stated that the baby was born stillborn and "wasn't moving at all."  M.S. explained that she used a sawing motion to cut the umbilical cord with a kitchen knife that her brother provided.

*January 27, 2016, Police Interview*

On January 27, 2016, McGehee and Brice interviewed M.S. in a video-recorded interview.  At the inception of the interview, McGehee informed M.S. of her rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.  M.S.'s parents were present in a waiting room during the interview.  Although her parents were not fluent in the English language, M.S., a high school student, spoke English and answered the detectives' questions.

Initially, M.S. claimed that the baby was born stillborn ("he hit his head" during birth) and that she used the knife to cut the umbilical cord.  She also admitted that she knew that she was

6

pregnant. With continued questioning, M.S. stated that she felt the baby's heartbeat, saw him breathing, but accidentally cut him. Finally, confronted with the medical examiner's findings, M.S. admitted that she cut the baby's throat but did not intend to kill him.

*January 27, 2016, Psychologist Interview*

Immediately following the interview, Doctor James Tahmisian conducted a mental status interview of M.S. to determine if she was psychotic. During the interview, he asked M.S. if she believed the baby might return to life after his injuries. She replied affirmatively, but then stated that she wanted the baby to return to life because she regretted her actions. Tahmisian concluded that M.S. did not display any psychotic thought processes; she responded to his questions although she was tearful and obviously upset.

*Other Evidence*

M.S.'s boyfriend testified that he and M.S. were sexually active for several years without the use of birth control. On an earlier occasion, he asked M.S. if she thought she was pregnant. She replied that she did not think so. In 2015, M.S. discussed with her friends whether she was pregnant then, but she was not. In 2015, a friend accompanied M.S. to purchase a pregnancy test. The test result was negative. M.S. also visited Planned Parenthood for a pregnancy test, but was unsuccessful in obtaining a test. She was not pregnant then either.

Several months prior to giving birth, M.S. texted her boyfriend and informed him that he would become "a baby daddy" and that she had breast milk. DNA testing of the infant's body confirmed that M.S.'s boyfriend was the biological father.

Data downloaded from M.S.'s cellular telephone reflected Internet searches on possible ways to cause a miscarriage and the treatment of abdominal pain during pregnancy. Some data had been sent to M.S.'s telephone from the cellular telephone of M.S.'s boyfriend.

M.S. presented expert witness testimony that she suffered from pervasive pregnancy denial, a dissociative disorder, and was in a dissociative state when she gave birth. She presented evidence that neither her parents, her friends, nor an examining physician (on an unrelated matter) knew that she was pregnant. M.S. also provided evidence that she suffered from childhood sexual abuse, sometime command hallucinations, and a history of cutting herself, among other psychological problems.

*Jurisdiction Order and Appeal*

Following a lengthy and contested jurisdictional hearing, the juvenile court found that M.S. committed second degree murder and that she personally used a knife during the offense. In its written ruling, the court stated that M.S. harbored express malice but that the prosecutor failed to prove beyond a reasonable doubt that M.S. acted with the requisite deliberation necessary for first degree murder. The court also stated that it considered but rejected the defense argument as unconvincing that M.S. lacked the required mental state for murder.

Following a contested disposition hearing, the juvenile court declared M.S. a ward of the court and ordered her placement at Casa Pacifica.

M.S. appeals and contends that 1) insufficient evidence of malice supports the jurisdiction finding; 2) police officers violated her Fourth and Fifth Amendment rights by speaking with her in the hospital and obtaining consent to search her cellular

telephone; 3) police officers violated her Fifth Amendment rights by not advising her pursuant to *Miranda* prior to the video reenactment; 4) her waiver of *Miranda* rights was not voluntary; and 5) her statements to Tahmisian were not voluntary. By supplemental briefing, M.S. asserts that we must reverse her conviction and remand the matter for consideration of the mental health diversion program of newly enacted section 1001.36. (*People v. Frahs* (2018) 27 Cal.App.5th 784, 791, review granted Dec. 27, 2018, S252220.) We requested and received supplemental briefing regarding application of the mental health diversion program to juvenile delinquency proceedings and to M.S. specifically.

## DISCUSSION

### I.

M.S. argues that there is insufficient evidence that she possessed the express intent to kill to support the malice element of second degree murder. Preferring a finding of involuntary manslaughter, she asserts that she accidentally cut the infant's neck when she cut the umbilical cord. M.S. contends that the evidence obtained from her cellular telephone and the interrogations was obtained in violation of her Fourth and Fifth Amendment rights and therefore must be disregarded.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *People v. Johnson* (2015) 60 Cal.4th 966, 988.) Our review is the same in a prosecution primarily resting upon circumstantial evidence

9

or in reviews of juvenile justice proceedings. (*Johnson*, at p. 988; *In re V.V.* (2011) 51 Cal.4th 1020, 1026.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].) We must accept logical inferences that the trier of fact might have drawn from the evidence although we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) Moreover, the testimony of a single witness is sufficient to prove a fact. (*People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031.)

Second degree murder is an unlawful killing of a human being with malice aforethought. (§§ 187, subd. (a), 188; *People v. Chiu* (2014) 59 Cal.4th 155, 166.) Express malice is an intent to unlawfully kill. (*People v. Smith* (2005) 37 Cal.4th 733, 739 [express malice requires evidence that the actor either desired that death result or knew to a substantial certainty that death would occur].) Evidence of intent to kill may be satisfied by proof of a single stab wound that penetrates a vital organ. (*People v. Bolden* (2002) 29 Cal.4th 515, 561.) "In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill." (*Ibid.* [stab wound five inches long and five inches deep].)

Sufficient evidence exists apart from any of M.S.'s admissions that she intended to kill her infant. The autopsy

10

findings indicated that the infant died from a sharp wound to his neck that severed his carotid artery and trachea and extended into his spine, exposing the spinal cord. The wound was seven centimeters long, from side to side. The nature of the wound's edges suggested that there had been two or three strikes, if not more. Also, the umbilical cord had a clean cut and the cord was not stretched or torn. The medical examiner concluded that the infant was alive when his throat was slashed and that blood likely sprayed the surrounding area in the bathroom. Blood droplets in the bathroom were seen and confirmed by luminol testing. The examiner concluded that the cause of death was homicide.

Moreover, the false statements that M.S. gave to hospital personnel allow an inference of her consciousness of guilt. M.S. at times stated that her baby had been born stillborn, that she may have flushed it in the toilet, and that she detached the umbilical cord by pulling it. The juvenile court properly considered her various and inconsistent explanations to determine guilt. (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 111, p. 938.)

## II.

M.S. argues that the police officers violated her Fourth and Fifth Amendment rights by speaking to her in her hospital room, obtaining her consent to search her cellular telephone, and photographing parts of her body. She asserts that she had a reasonable expectation of privacy in her hospital room and thus a search warrant was required to enter the room, question her, obtain her consent to search her telephone, and intrusively photograph her.

11

M.S. has forfeited her Fifth Amendment argument because she did not raise it in the trial court.  Her suppression motion regarding the hospital interviews and consent to search her telephone rested on Fourth Amendment grounds only, not the Fifth Amendment.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1170 [failure to raise *Miranda* argument in trial court deprives court of opportunity to resolve factual disputes].)  Whether M.S. was then in custody, among other issues, was not litigated and the juvenile court made no factual finding on this issue.

Moreover, the officers' entry into M.S.'s hospital room did not violate her reasonable expectation of privacy.  (*People v. Brown* (1979) 88 Cal.App.3d 283, 290-292.)  Detectives Brice and McGehee were dressed in plain clothes, the hospital room door was open, a nurse was present at some point, and the detectives knocked and announced their presence.  Under the circumstances, the hospital room was within the joint dominion of the hospital and M.S.  (*Id.* at p. 291.)  "[N]o Fourth Amendment violation occurs when a nurse permits an officer to enter a sentient patient's hospital room for purposes unrelated to a search, [and] the patient does not object to the visit."  (*Id.* at p. 292.)  At the time the officers entered M.S.'s hospital room, they were attempting to determine whether "a medical event" [still birth] or a crime had occurred.  M.S. also did not object to the officers' presence.

In addition, it was objectively reasonable for Brice "to believe that the person giving consent [for the telephone search] had authority to do so, and to believe that the scope of the consent given encompassed the item searched."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 974.)  Regarding this issue, we defer to the juvenile court's express and implied findings of fact

12

that are supported by substantial evidence. (*Id*. at p. 973.) Brice returned to the hospital after the infant's body was found, asked M.S. for permission to search her telephone, and read and reviewed a consent-to-search form with her. The form broadly permitted any investigation of M.S.'s telephone that could result in potential evidence, and informed M.S. that she could refuse consent. M.S. signed the consent form and provided Brice her passcode for the telephone. The juvenile court concluded that M.S.'s consent was freely and voluntarily given, impliedly considering her obvious chronological age and medical condition. Sufficient evidence supports the express finding of consent.

We need not discuss whether the photographs taken of M.S.'s stomach and groin required the issuance of a search warrant. The photographs taken from a cooperative M.S. established nothing of significance to the prosecution; that she had recently given birth was not contested and was established by overwhelming evidence. Assuming it was error to admit evidence of the photographs, any error was harmless beyond a reasonable doubt and could not have contributed to the jurisdiction finding.

### III.

M.S. asserts that she was in custody when she participated in the video reenactment of the birth and that the officers' failure to administer *Miranda* rights violated her Fifth Amendment rights.

When officers searched the family's apartment pursuant to a search warrant, they served M.S.'s parents with the search warrant and advised that they would like to speak with M.S. Detective McGehee asked M.S. to demonstrate in a video-recording what occurred with her infant. He informed her that

13

she was "not in any trouble," "free to leave," and did not "have to do this." M.S.'s mother, through an interpreter, stated that M.S. does want to "show . . . what happened." McGehee stated that they would "take it slow," and asked if M.S. was "doing okay," and if she would "be able to do" a reenactment. M.S. responded affirmatively. At one point, McGehee asked if M.S. would like a respite from the reenactment; the parties then stopped and resumed after a while.

In ruling on M.S.'s suppression motion, the juvenile court noted that the contact occurred in M.S.'s home and the police were aware of her obvious age. M.S. and her parents consented to the reenactment after being informed that M.S. did not have to participate. The court found that the officers "took great care to make sure this was not a coercive environment [and were] sensitive to [M.S.'s] physical condition." The court then denied the suppression motion because it concluded that M.S. was not in police custody at the time.

In our independent review, the juvenile court's ruling was proper and supported by substantial evidence. (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970 [standard of review].) It is well settled that *Miranda* advisements are required only during custodial interrogations. (*Ibid.*) Whether a person is in custody is an objective test, i.e., whether there was a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest. (*Id.* at pp. 971-972.) Factors to consider include whether there has been a formal arrest, the location of the detention, the ratio of officers to the individual, and the demeanor of the officer or officers, among other factors. (*Id.* at p. 972.)

14

Here the reenactment occurred at M.S.'s apartment with the knowledge and presence of her parents. McGehee informed M.S. that she did not have to participate and was free to leave. He was not confrontational or aggressive and was sensitive to her physical condition. The reenactment lasted for approximately 30 minutes, during which time M.S. demonstrated that she accidentally cut the infant's neck while cutting the umbilical cord – an explanation she had given previously to police officers. Sufficient evidence supports the juvenile court's express finding that M.S. was not in custody when she participated in the video reenactment.

## IV.

M.S. contends that she did not validly waive her *Miranda* rights during the January 27, 2016, formal police interview. She asserts that she was physically exhausted from giving birth 10 days prior and suffered from posttraumatic stress disorder. She argues that the detectives used coercive tactics and points out that she had no prior experience with law enforcement.

To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375 [interrogation of 15-year-old charged with murder and burglary].) Determining the validity of a *Miranda* rights waiver requires an evaluation of the defendant's state of mind and an inquiry into the circumstances of the interrogation. (*Id.* at p. 375.) When a juvenile's waiver is at issue, consideration must be given to factors such as the juvenile's age, experience, education, background and intelligence, and whether he or she has the capacity to understand the *Miranda* warnings, the nature of their Fifth

Amendment rights, and the consequences of waiving those rights. (*Fare v. Michael C.* (1979) 442 U.S. 707, 725; *Nelson*, at p. 375 [totality of circumstances test applies in determining whether a minor's waiver is valid].)  On review, we defer to the trial court's factual findings that are supported by sufficient evidence, but independently review whether the waiver was voluntary.  (*People v. Holloway* (2004) 33 Cal.4th 96, 114.)

The juvenile court determined that M.S. made a knowing, intelligent, and voluntary waiver of her *Miranda* rights.  The record supports this determination.  At the outset of the interview, McGehee asked how M.S. was feeling and if she had a counseling appointment that day.  Following her statement that she felt okay, McGehee read her *Miranda* rights.  M.S. responded affirmatively that she understood her rights and wanted to speak with the detectives.  The detectives invited M.S. to call them by their first names and, as the juvenile court concluded, the interview was friendly and conducted by detectives with whom M.S. was now familiar.  The detectives offered no promises of leniency in exchange for M.S.'s testimony nor did they threaten to prosecute her for a greater offense if she did not speak with them. We reject M.S.'s contention that McGehee's offer to obtain counseling for M.S. (who already was in counseling) was an offer of leniency.  M.S. was 15 years old and a sophomore in high school.  She spoke rationally in the English language during the interview and never indicated that she wanted to stop the questioning or see her parents.  The prosecution met its burden of establishing that M.S.'s waiver was knowing, intelligent, and voluntary.

*V.*

M.S. argues that the juvenile court erred by admitting evidence of her interview with Doctor Tahmisian. She contends that her statements to him were not knowing and voluntary.

At the outset of Tahmisian's interview with M.S., he informed her of her *Miranda* rights and that her statements to him would not be kept confidential. In permitting evidence of this interview, the juvenile court concluded it was a continuation of the prior interview. The court added that M.S.'s statements may not be of significance at the jurisdiction hearing.

Assuming for purpose of argument that M.S.'s statements were inadmissible, any error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The evidence establishes that M.S. cut her infant's throat with two or three strikes, severing his carotid artery and trachea. The juvenile court rejected M.S.'s theory of an accidental cutting. It also rejected the evidence that she did not have the requisite mental state to commit second degree murder.

*VI.*

M.S. contends that she is entitled to remand to allow the juvenile court to make an eligibility determination regarding mental health pretrial diversion according to newly enacted sections 1001.35 and 1001.36. She points out that she presented evidence that she suffered from pervasive pregnancy denial, a dissociative disorder, and posttraumatic stress disorder at the time of her crime. M.S. argues that the statute applies retroactively, relying upon *People v. Frahs, supra,* 27 Cal.App.5th 784, 791, review granted.

Effective June 27, 2018, the Legislature enacted a mental health diversion program for defendants with diagnosed and

17

qualifying mental disorders, including bipolar disorder, schizophrenia, or posttraumatic stress disorder.  (§ 1001.36, subds. (a) & (b).)  A stated purpose of the legislation is to promote "[i]ncreased diversion of individuals with mental disorders . . . while protecting public safety."  (§ 1001.35, subd. (a).)  Section 1001.36, subdivisions (a) and (b)(1) provide that the court may grant pretrial diversion if a defendant meets these six requirements:  1) the court is satisfied that the defendant suffers from a qualifying mental disorder, as defined by the statute; 2) the court is satisfied that the defendant's mental disorder played a significant role in the commission of the charged offense; 3) a qualified mental health expert opines that the defendant's symptoms motivating the criminal behavior would respond to mental health treatment; 4) the defendant consents to diversion and waives his or her right to a speedy trial; 5) the defendant agrees to comply with treatment as a condition of diversion; and 6) the court is satisfied that the defendant will not pose an unreasonable risk of danger to public safety if treated in the community.  (*Id.*, subd. (b)(1)(A)-(F).)  The Legislature enacted the diversion statutes to ameliorate possible punishment for a class of individuals with qualifying mental health disorders by increasing diversion "to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety."  (§ 1001.35, subd. (a).)

If the trial court grants pretrial diversion, the defendant "may be referred to a program of mental health treatment utilizing existing inpatient or outpatient mental health resources" (§ 1001.36, subd. (c)(1)(B)) for "no longer than two years" (*id.*, subd. (c)(3)).  If the defendant performs "satisfactorily in diversion, at the end of the period of diversion, the court shall

18

dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).)

*People v. Frahs*, *supra*, 27 Cal.App.5th 784, 791, review granted, held that the mental health diversion law applies retroactively to those defendants whose appeals are pending at the time of the statute's enactment. "[T]he Legislature 'must have intended' that the potential 'ameliorating benefits' of mental health diversion . . . 'apply to every case to which it constitutionally could apply.'" (*Ibid.*) *Frahs* relied upon our Supreme Court's holding in *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, holding that a juvenile transfer hearing must be made available to all defendants whose convictions are not yet final on appeal. (*Frahs*, at p. 791.)

Effective January 1, 2019, section 1001.36 was amended, however, to eliminate application of the diversion program to certain enumerated violent crimes. Section 1001.36, subdivision (b)(2)(A) exempts murder or voluntary manslaughter from the diversion program, along with other serious sexual or violent crimes. "'[I]n the absence of contrary indications, a legislative body ordinary intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*People v. Superior Court (Lara)*, *supra*, 4 Cal.5th 299, 308.) The corrective legislation here expresses the legislative intent with sufficient clarity that we can discern and must effectuate. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1049.) M.S.'s appeal of her second degree murder conviction was pending on and after the effective date of the corrective amendment. As such, the pretrial mental health diversion procedure does not

apply to her pursuant to the exclusion of section 1001.36, subdivision (b)(2)(A).

More importantly, however, distinctions between adult criminal prosecutions and juvenile delinquency proceedings preclude application of the mental health diversion law to juvenile cases.  Indeed, Welfare and Institutions Code section 203 states: "An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding."[2]

*People v. Vela* (2018) 21 Cal.App.5th 1099, 1104-1105, summarizes the distinctions between the processes and purposes of the juvenile adjudication system versus adult criminal prosecutions:

"Generally, any person under the age of 18 who is charged with violating a law is considered a 'minor.'  (See § 602.)  A 'juvenile court' is a separate, civil division of the superior court.  (§ 246.)  A prosecutor charges a minor with an offense by filing a juvenile petition, rather than a criminal complaint.  (See §§ 653.7, 655.)  Minors 'admit' or 'deny' an offense, rather than plead 'guilty' or 'not guilty.'  (§ 702.3.)  There are no 'trials,' per se, in juvenile court, rather there is a 'jurisdictional hearing' presided over by a juvenile court judge.  (§ 602.)  The jurisdictional hearing is equivalent to a 'bench trial' in a criminal court.  (See Cal. Rules of Court, rule 5.780.)  Although a juvenile court judge adjudicates alleged law violations, there are no 'conviction[s]' in juvenile court.  (§ 203.)  Rather, the juvenile court determines—under the familiar beyond the reasonable doubt

_____

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

20

standard and under the ordinary rules of evidence–whether the allegations are 'true' and if the minor comes within its jurisdiction.  (See § 602 et seq.)

"There is no 'sentence,' per se, in juvenile court.  Rather a judge can impose a wide variety of rehabilitation alternatives after conducting a 'dispositional hearing,' which is equivalent to a sentencing hearing in a criminal court.  (§ 725.5; *In re Devin J.* (1984) 155 Cal.App.3d 1096, 1100 [202 Cal.Rptr. 543].)  In the more serious cases, a juvenile court can 'commit' a minor to juvenile hall or to the Division of Juvenile Justice (DJJ), formerly known as the California Youth Authority (CYA).  In order to commit a minor to the DJJ, the record must show that less restrictive alternatives would be ineffective or inappropriate.  (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576 [258 Cal.Rptr. 540].)  The DJJ, rather than the court, sets a parole consideration date.  DJJ commitments can range from one year or less for nonserious offenses, and up to seven years for the most serious offenses, including murder.  (See Cal. Code Regs., tit. 15, §§ 4951-4957.)  A minor committed to DJJ must generally be discharged no later than 23 years of age.  (§ 607, subd. (f).)"

The purpose of the mental health diversion statute is to promote "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety."  (Pen. Code, § 1001.35, subd. (a).)  "Pretrial diversion" means "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ."  (*Id.*, § 1001.36, subd. (c).)  Thus, the primary purpose of the diversion statutes is to treat the

mentally ill adult outside the criminal justice system rather than to punish them inside the system.  The juvenile justice system, however, is already separate and distinct from the criminal justice system–there is not accusatory pleading, no possibility of conviction, and no punishment.

Here the juvenile court imposed a rehabilitation program for M.S. consistent with the purposes of the juvenile law.  (§ 202, subd. (b) ["Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment, and guidance consistent with their best interest and the best interest of the public"].)  At the disposition hearing, the court discussed M.S.'s psychological needs, her risk of self-harm, and her need for continued counseling.  After discussing the purposes of juvenile delinquency proceedings, the court placed M.S. in the highest level of a group home.  The court's rehabilitation program itself distinguishes the adult criminal system from the juvenile justice system.

The juvenile court's order is affirmed.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

We concur:


YEGAN, J.


TANGEMAN, J.


22

YEGAN, J., Concurring:

I have signed and I concur with the majority opinion. There is no need to reach the constitutionality of the newly enacted mental health diversion statute. (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102.) My concurrence should not be considered an opinion that the subject statute is constitutional.

CERTIFIED FOR PUBLICATION.


YEGAN, J.

1

TANGEMAN, J., Concurring:

I have signed and I concur with the majority opinion.  For those reasons expressed therein, there is no need to reach the issue of the applicability of the newly enacted mental health diversion statute to juvenile proceedings.  I therefore express no opinion on that subject in accordance with the "'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more.'  [Citation.]" (*People v. Contreras* (2018) 4 Cal.5th 349, 381.)

CERTIFIED FOR PUBLICATION.


TANGEMAN, J.

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.