Filed 7/20/23  In re T.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.H.,<br><br>　　a Persons Coming Under the Juvenile Court Law. | |
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>T.H.,<br><br>　　Defendant and Appellant. | A165707<br><br>(Solano County Super. Ct. No. J290728) |

T.H. appeals the order of the juvenile court sustaining allegations of a Welfare and Institutions Code section 602 petition that he received stolen property (a car) in violation of Penal Code section 496d, subdivision (a).[1]  He argues the court erred when it denied the motion to suppress his statements made to police officers because they were involuntary and obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  T.H. also

---

[1]　All further statutory references are to the Penal Code unless otherwise indicated.

1

contends there was insufficient evidence to support the court's finding that he knew the car was stolen. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 24, 2021, Christina D. left her 2016 Chevy Impala parked in the driveway of her Sacramento home. When she returned the following evening, the car was gone. She had not given anyone permission to drive the car and reported it stolen.

On December 26, 2021, Bryan Hamilton, a Fairfield police officer, responded to an alert from a license plate reader system that located Christina's car in front of T.H.'s family home. When Officer Hamilton arrived, about four patrol cars were already there, all part of a plan to block in the vehicle. Officer Hamilton waited down the road where spike strips were set in case someone tried to flee with the car.

After about an hour, fellow officers issued an alert that T.H. had entered the car, and they were initiating contact with him. Officer Hamilton proceeded to the location of the car and, upon arrival, saw T.H. being removed from a white Chevy Impala. The car was in generally good condition, with no broken windows or body damage. Its license plate matched that of Christina's car.

T.H. was arrested and, after some back-and-forth with officers about the reasons for his arrest, was given a *Miranda* warning. Officer Hamilton wore a body camera which recorded the arrest. T.H. was 17 years old at the time.

Following the *Miranda* warning, T.H. told Officer Hamilton that he bought the Impala in Oakland the previous day for $600 and a pair of shoes. T.H. had no documentation reflecting the purchase but said he was supposed to return to get paperwork. Further, according to Officer Hamilton, after

2

officers told him the car was stolen, T.H. "did say that he knew it was stolen, and right after that he said that he didn't know it was stolen."

The Solano County District Attorney filed a juvenile wardship petition under Welfare & Institutions Code section 602 alleging T.H. received stolen property, a motor vehicle, a felony in violation of section 496d, subdivision (a).

At the contested jurisdictional hearing, T.H. unsuccessfully moved to suppress all his statements after the *Miranda* warning. At the end of the hearing, the court found the People met its burden in establishing T.H. committed the felony violation and sustained the juvenile wardship petition.

At the dispositional hearing, the court denied T.H.'s motion to reduce the felony charge to a misdemeanor. The court adjudged T.H. a ward of the court and placed him on in-home probation, including 90 days in juvenile hall. It also imposed various terms and conditions. T.H. now appeals the court's orders.

## DISCUSSION

### I. Motion to Suppress

T.H. contends the juvenile court violated his constitutional rights by denying his motion to suppress statements made while in custody post-*Miranda*. Specifically, he argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights because: (1) the police obtained his waiver through psychologically coercive interrogation tactics; and (2) he did not understand his rights and the consequences of waiving them. We are not persuaded.

### A. Additional Facts

At the outset of the jurisdictional hearing, T.H. moved to suppress the statements he made to officers after he received the *Miranda* warning.

3

The juvenile court reviewed and admitted into evidence Officer Hamilton's body camera footage depicting T.H.'s arrest and custodial interrogation. The video showed the following:

It was late afternoon on a rainy, overcast day when Officer Hamilton arrived at the scene, a residential street in front of T.H.'s family home. Officer Hamilton joined about three other officers on the scene. Their patrol cars, at least one with patrol lights flashing, surrounded the Impala which was parked on the curb with the driver's side door open. An officer walked T.H. backwards from the front of the Impala to the rear of one of the patrol cars while handcuffed behind his back. As he was being moved, T.H. explained, "I just got this car." Meanwhile, the front door of T.H.'s house was open, and it appears his father was observing from the doorway.

While standing handcuffed behind the patrol car, T.H. asked, "Can I ask please . . ." when the officer responded: "The car's stolen." T.H. returned: "The car's stolen? The car is stolen? I just got this car. I just got this car from Oakland. I can show y'all proof and everything." The officer replied, "You bought it?" T.H. answered, "I just bought this." At that point, T.H.'s father appears to have said something from the house, prompting T.H. to turn towards his house and say: "Huh? He said the car is stolen," adding, "Bro . . . Call . . . Bro . . . This n*** said . . . Bro. . . Why would I bring a stolen . . ."

Another officer approached T.H. and they had the following exchange:

Officer ("O."):     Where'd you buy it from?

T.H.: Oakland.

O.:     Was it like a dealership? Was it like offer-up? Craigslist?

T.H.: No, off of somebody. I just bought it off somebody.

O.:     How did you communicate with them?

4

T.H.: Some dude in Oakland, I knew him through somebody.  I don't know him personally.

O.: How did you communicate with them?

T.H.: Through my friend.  I wouldn't bring a stolen . . .

At that point, Officer Hamilton stated, "[T.], we're going to sit you in the car, read you your rights, and talk to you a little bit more about it ok?"  T.H. responded, "Yeah."  Officer Hamilton continued, "Because obviously we've got a lot of questions for you alright?"  As he made his way to the backseat of the patrol car, T.H. said, "Bro I knew this car was stolen bro . . . but this n*** . . . bro."  Another officer replied, "You're saying you knew this was stolen?" and T.H. stated, "No because it sounded [too] good to be true," and entered the back seat of the patrol vehicle.  As he slid further into the car, T.H. stated: "I paid six hundred."

Standing outside the open rear door of the patrol car, Officer Hamilton said to T.H.: "[T.], like I said, we got a bunch of questions so I'm gonna read you your rights . . . [¶] . . . so I can ask you those questions so you can kinda tell me what you know because it sounds like a big mix up."  T.H. responded, "Yeah" at least a couple of times.  Officer Hamilton then gave T.H. the following *Miranda* advisements: "So you do have the right to remain silent.  You have the right to an attorney and have that attorney present both before and during your questioning.  Anything you say may be used against you in court.  And if you can't afford to hire an attorney, one will be provided to you free of charge if you wish."  Officer Hamilton then asked T.H.: "Do you understand all those?"  T.H. responded, "Yeah."

After receiving T.H.'s response, Officer Hamilton (while remaining standing outside the backdoor of the patrol car) and T.H. (still seated in the backseat) had the following exchange:

H.[2]: So I understand you bought the car in Oakland, how long ago?

T.H.: Yesterday. Literally last night.

H.: How'd that transaction go?

T.H.: I met him through my friend in Oakland. It was in an apartment and my friend, I swear to God, he told me he had a car for me. Let me see it. You feel me? He let me see the car . . . like . . . I wouldn't bring no stolen car in front of my house. . . .

H.: Right.

T.H.: Like he . . . gave me the car. I seen it. He let me drive it. He like "it's not stolen or nothing." I'm like okay okay, where the paperwork? He said . . . "Just come back and get it today." I was supposed to go back out there and get the registration and stuff for the car.

H.: Okay.

T.H.: I gave him six hundred dollars and some shoes for the car.

H.: Okay.

T.H. Like I just got off probation and shit like . . .

H.: You didn't think something was up with that . . . what year is that . . . 2022?

T.H.: No, that car? No.

H.: I think it's pretty new isn't it?

T.H.: I don't know. It's just like . . . I wouldn't, I didn't steal no car. I literally didn't steal the car.

H.: I . . . I don't think you stole the car at all. But don't you think it's probably hot if you're paying six hundred dollars and a pair of shoes for a newer car? I mean, this ain't no '92 Honda.

---

2        H. refers to Officer Hamilton.

T.H.: Because, because. He knew the guy. He talking bout, he got the . . . he gets cars off the auction. So like he gets cars off the auction that's not expensive.

T.H. further stated that he didn't know the name of the person from whom he bought the car. He stated that he did not receive any papers when buying the car, such as a bill of sale. He informed Officer Hamilton of the rough location in Oakland where he bought the car. T.H. emphasized that he wouldn't drive in a stolen car. The post-*Miranda* interrogation lasted approximately two minutes.

After watching the body camera footage, the court heard testimony from Officer Hamilton and the arguments of the parties.

The court denied T.H.'s motion to suppress. It explained: "In this case there's nothing in the record that persuades the court that the minor did not understand and waive his *Miranda* rights . . . [¶] He was informed of his rights by the officers and he answered in the affirmative without hesitation that he did understand them. He indicated in comments that he had been on probation, so there is an indication that he has familiarity with the criminal justice system. The court does not find coercion on behalf of law enforcement, the court does not find that the officer's comments promise leniency or implied he would be released if he spoke with the officers. [¶] Under all the circumstances of this encounter the court finds that the minor's will was not overborne at the time he made statements to the officers. Based upon that, the minor's statements to the officers are found to be voluntary after a knowing and intelligent waiver of his *Miranda* rights."

## B.   Applicable Law

"The Fifth Amendment to the United States Constitution provides that '[n]o person . . . shall be compelled in any criminal case to be a witness

against himself . . . .' [Citation.]  In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court ' "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." [Citations.]'  Under *Miranda* and its progeny, ' "a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel." '  [Citation.]  To be valid, a *Miranda* 'waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' ' " (*People v. Jones* (2017) 7 Cal.App.5th 787, 809 (*Jones*).)

"Juveniles, like adults, may validly waive their *Miranda* rights." (*Jones*, *supra*, 7 Cal.App.5th at p. 809.)  "To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary.  [Citation.] Determining the validity of a *Miranda* rights waiver requires an evaluation of the defendant's state of mind and an inquiry into the circumstances of the interrogation.  [Citation.]  When a juvenile's waiver is at issue, consideration must be given to factors such as the juvenile's age, experience, education, background and intelligence, and whether he or she has the capacity to understand the *Miranda* warnings, the nature of their Fifth Amendment rights, and the consequences of waiving those rights.  [Citations.]  On review, we defer to the trial court's factual findings that are supported by sufficient evidence, but independently review whether the waiver was voluntary." (*In re M.S.* (2019) 32 Cal.App.5th 1177, 1189.)

## C.  Analysis

We have reviewed the video footage of T.H.'s detention and conclude the totality of the circumstances supports the juvenile court's determination that T.H. made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

Officer Hamilton read T.H. his *Miranda* rights and asked if he understood.  T.H. responded affirmatively that he understood his rights and then proceeded to respond to Officer Hamilton's various questions about the car.  While T.H. did not say words along the lines of "I waive my rights," courts have regularly recognized the validity of implicit waivers in similar circumstances involving juveniles.  (See, e.g., *People v. Nelson* (2012) 53 Cal.4th 367, 375 (*Nelson*) [juvenile's voluntary responses to officer's questions post-*Miranda* waiver after juvenile confirmed understanding of rights constituted valid waiver]; *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*) [juvenile implicitly waived *Miranda* rights by willingly answering questions after acknowledging he understood those rights].)  Moreover, Officer Hamilton and his fellow officers appeared calm, civil, and professional in their interactions with T.H. and their conduct was not overbearing, threatening, or coercive.  No officer promised T.H. leniency in exchange for his testimony nor did any officer threaten to prosecute T.H. if he did not speak with them.

For his part, T.H. appeared to understand why he was being detained and the officer's questions.  He did not appear afraid of the officers or unable to fully comprehend what was happening.  At the time, he was just shy of his 18th birthday by two months and had prior arrests.  As the juvenile court observed, T.H. was not a stranger to criminal proceedings.  T.H. himself informed the officers that he had just completed probation.  He had

previously been declared a ward of the juvenile court in 2019 and had completed probation in that matter. In sum, the prosecution met its burden in establishing by a preponderance of the evidence that T.H. impliedly waived his *Miranda* rights by answering Officer Hamilton's questions and the waiver was knowing, intelligent, and voluntary.

T.H. argues there was no knowing, intelligent, or voluntary waiver of *Miranda* rights because the police used psychologically coercive tactics to obtain the waiver by isolating and interrogating him in the backset of a patrol car apart from his father; inducing his statements by minimization strategies, promising leniency, and deception; and cajoling T.H. into talking to him based on repeated statements implying that T.H. would talk to him before being read his *Miranda* warning. We reject these arguments.

Placing T.H. in the backseat of the patrol car for questioning was not unduly coercive. The interrogation occurred while there was still daylight on a residential street in front of T.H.'s house. The patrol car was a large SUV, and the door was open to the street and neighbors while the interrogation – which lasted only approximately two minutes – took place. The officers comported themselves professionally and with courtesy. The officer's decision to not hold the interview in front of T.H.'s father or in the house did not invalidate the waiver. (See *Nelson*, *supra*, 53 Cal.4th at p. 375 [failing to seek consent from parent did not invalidate juvenile's waiver].) While in the patrol car, T.H. never indicated that he wanted to speak with his father, and there is no indication that officers would have prevented him from doing so had he made the request. When he communicated with his father earlier by yelling across the front yard, no officer stopped him from doing so.

To the extent Officer Hamilton's statement that the incident appeared to be a "big mix up" can be characterized as a minimization tactic, it did not

10

implicitly promise T.H. any sort of leniency that invalidated the waiver. " 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) Moreover, even where there is an express or implied promise of leniency, a subsequent admission by a suspect is not involuntary unless the promise was "the motivating cause of the decision to speak." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) None of the officers ever induced T.H.'s statements with any promise of leniency. While Officer Hamilton's "big mix up" statement encouraged T.H. to tell the truth, it did not convey any benefit T.H. would receive in exchange for his cooperation. And even before he was *Mirandized*, T.H. spontaneously expressed that he knew the car was stolen.

Officer Hamilton also did not cajole or trick T.H. into waiving his rights. In *Miranda, supra*, 384 U.S. at 476, the court warned that "evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (*Id.* at p. 476.) T.H. asserts that Officer Hamilton engaged in such cajoling and trickery by stating, or presuming, that T.H. would speak to him after being read his advisements. Again, T.H. had already made several spontaneous statements about his purchase of the car before Officer Hamilton interjected and told him that they were going to seat him in the patrol car then "read [him his] rights and talk to [him] a little bit more about it." Even as he was being walked to the back of the patrol car, he continued to make more

admissions such as "Bro I knew this car was stolen . . ." T.H.'s statements did not result from any trickery.

T.H. also argues there was no knowing, intelligent, or voluntary waiver because he did not comprehend the nature of his constitutional rights and the consequences of waiving them. He avers he lacked the requisite level of comprehension based on the rapid way his rights were given and the absence of any written advisements to review. We are not persuaded. At the time of his arrest, T.H. was 17 years old – two months shy of turning 18 – and a high school graduate, indicating he had the capacity to understand the *Miranda* warnings as given. Our review of the video footage shows that Officer Hamilton recited the *Miranda* warnings in a reasonable, comprehensible manner in a normal conversational tone and speed. There was nothing in the video indicating that T.H. misheard or misunderstood any advisement given; he expressly confirmed he understood his rights and showed no confusion.

Finally, T.H. contends there was no knowing, intelligent, or voluntary waiver based on the totality of the circumstances. We remain unpersuaded. Nothing in the record suggests T.H. was unable to understand, or did not understand, the meaning of the rights to remain silent and to have the assistance of counsel, and the consequences of waiving those rights. As noted, T.H. was very close to 18 years old and a high school graduate. (See *People v. Lewis* (2001) 26 Cal.4th 334, 384–385 [valid *Miranda* waiver by 13-year-old]; *In re Charles P.* (1982) 134 Cal.App.3d 768, 772 [valid *Miranda* waiver by 12-year-old].) While no evidence was offered regarding whether T.H. had previously been advised of his rights under *Miranda*, his comment to Officer Hamilton that he "just got off probation" revealed some familiarity with the criminal justice system that reasonably informed his waiver. (See *Lessie, supra*, 47 Cal.4th at p. 1169 [knowing and intelligent waiver informed

by defendant's prior probation and previous interactions with criminal justice system as a juvenile].) When the totality of the circumstances are considered, it does not support a finding that T.H.'s statements to Officer Hamilton were the result of coercive police tactics that overcame his will and rendered his statements involuntary. The juvenile court accordingly did not err in admitting the statements at trial. Having reached this conclusion, we need not address T.H.'s argument that he suffered prejudice from any purported error.

## II.    Sufficiency of the Evidence

T.H. asserts there was insufficient evidence to support the court's finding that he received stolen property in violation of section 496d. We disagree.

### A.    Additional Facts

Following the contested jurisdictional hearing, the juvenile court found the People met its burden in establishing T.H. committed the felony violation of section 496d, subdivision (a) and sustained the petition. The court expressly found: (1) the Impala was stolen from Sacramento; (2) T.H. purchased the stolen car; and (3) T.H. knew the car was stolen when he bought it.

With respect to its finding that T.H. knew the car was stolen, the court explained: "[A]s it relates to knowledge, I base [my finding] on a number of factors, which include comments he made at the time of his arrest, quote, 'Bro, I knew this car was stolen, Bro, but this'. . . . And then Officer Hamilton said, 'You said you knew this was stolen?' And he says, 'No, because it sounded [too] good to be true,' which is kind of an equivocation – not 'kind of,' it is an equivocation because first he said he knew it was stolen, and then he says 'no,' and then he says 'because it sounded [too] good to be true,' which, in

13

and of itself, doesn't make a lot of sense, and it seems to be an attempt to back-track what his statement was about knowing the car was stolen." The court also cited the terms of the transaction to support its finding: "600 dollars and a pair of sneakers for a 2016 Chevrolet Impala automobile that . . . was in good condition, no damage, was in good running order. Clearly it got from Sacramento to Oakland and then Oakland to Fairfield with no mechanical defects. So you clearly have a motor vehicle whose value was clearly in excess of the 950 dollars that was the subject of this transaction. Was it a business transaction, arm's length transaction? No, it wasn't. It was all cash, pair of shoes. We don't have the names of any of the individuals involved. A friend connected [T.H.] with the person who sold it to him, with no names, no paperwork for the car. . . . And then he says he was told to come back and get [the paperwork] the next day. That's not the kind of transaction that is – involves anything of an arm's length legitimate transaction. [¶] And coupled with his earlier statement where he said, quote, 'I knew the car was stolen,' and the terms of this transaction, that this was clearly, to the parties involved, the sale of stolen merchandise."

## B. Applicable Law

Our review of T.H.'s substantial evidence claim is governed by the same standard applicable to adult criminal cases. (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) " 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' ' "[O]ur role on appeal is a limited one." [Citation.] Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.]

14

Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.' " (*Ibid.*)

Section 496d, subdivision (a) provides: "Every person who buys or receives any motor vehicle [and other listed types of vehicles] that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any motor vehicle . . . from the owner, knowing the property to be so stolen or obtained, shall be punished . . ." (§ 496d, subd. (a).) Thus, a conviction for receiving stolen property requires that the prosecution prove: (1) the vehicle was stolen; (2) the defendant received, concealed, or withheld the vehicle from the owner; and (3) the defendant knew the vehicle was stolen. (§ 496d, subd, (a); *People v. Vann* (1974) 12 Cal.3d 220, 224.) "Knowledge that property was stolen can seldom be proved by direct evidence and resort must often be made to circumstantial evidence." (*Ibid.*)

## C. Analysis

T.H. does not raise any contentions related to the first two elements of the crime, arguing only that the evidence fell short of establishing the third element, namely, that he knew the car was stolen when he bought it.

We conclude there was substantial evidence to support the court's finding that this knowledge element was satisfied. When T.H. was arrested and walked to the back seat of the patrol car, he stated, "Bro, I knew this car was stolen." When one of the officers asked if he knew the car was stolen, T.H. replied, "No because it sounded [too] good to be true." Although the statements appear contradictory, they indicate T.H.'s awareness of the

15

lopsided terms of the deal and could indicate the vehicle was stolen. Further, as the juvenile court emphasized, other circumstances also suggested T.H. knew the car was stolen. T.H. appeared not to know the name of the person he bought the car from and could not disclose the identity of the seller. He did not identify the friend who acted as their go-between. He did not purchase it at a dealership or in response to an ad listing. He was given no bill of sale or any other paperwork to document the purchase or ownership. (See *People v. Williams* (1967) 253 Cal.App.2d 952, 958, superseded by statute on other grounds ["It is well established that evasive answers by a defendant to material questions with reference to the ownership of stolen property, or to the manner in which the defendant claims to have acquired such property, or, as is generally stated, a failure on the part of the defendant to satisfactorily explain his possession, may be sufficient upon which to base an inference of guilty knowledge."].) Moreover, he paid only $600 and a pair of shoes for a 2016 car in good condition. (See *People v. Malouf* (1955) 135 Cal.App.2d 697, 706 [knowledge that property was stolen can be established by sale of property at grossly inadequate price].) These dubious circumstances surrounding T.H.'s purchase of the car further support the court's inference that he knew it was stolen.

T.H. argues that his statement – "I knew the car was stolen" – was not an admission but an expression of his "despair, disbelief, and frustration" at having been told by police that the car was stolen and being arrested. Because he subsequently clarified he did not know the car to be stolen, only that it was a deal too good to be true, T.H. claims the value of this "isolated evidence was controverted and undermined" by his repeated statements that he did not know the car was stolen. But a reversal for insufficient evidence is unwarranted " 'unless it appears "that upon no hypothesis whatsoever is

there sufficient substantial evidence" ' " to support the trier of fact's findings. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Despite his subsequent backtracking, the trier of fact could reasonably have understood his initial statement to officers that he knew the car was stolen to be his unfiltered, genuine view of the car he was purchasing. Based on this initial statement and the suspicious circumstances surrounding the sale, the juvenile court was presented sufficient evidence from which it could reasonably infer T.H. knew the car was stolen.

None of T.H.'s other arguments undermine the substantial evidence in the record in support of the court's finding on knowledge. For instance, T.H. argues that there was no evidence to support the court's finding that the car's value exceeded $950 because there was no evidence of the value of the car or the shoes. He also asserts that there was no evidence that he made any false claims about how he obtained the car, or that he made any alterations to the car to change its appearance. In light of the evidence that reasonably establishes T.H. knew the car to be stolen, the absence of this other evidence highlighted by T.H. does not warrant reversal on a substantial evidence review.

## DISPOSITION

The juvenile court orders are affirmed.

17

_____

Petrou, J.

WE CONCUR:

_____

Tucher, P.J.

_____

Fujisaki, J.

A165707/*People v. T.H.*