Filed 9/15/22  P. v. Oryall CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078561 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CRN8537) |
| MICHAEL ORYALL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Christopher Nalls and Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Oryall sought resentencing under Penal Code[1] section 1172.6 (formerly section 1170.95).[2] The trial court denied the petition, finding that Oryall was an aider and abettor who acted with intent to kill, and separately that Oryall was a major participant in the underlying crime who acted with a reckless indifference to human life. The court declined to consider Oryall's youth at the time of the crime, explaining those considerations had been made when he was charged, and youthfulness could be reconsidered at his youthful offender parole hearing.

Oryall contends there is insufficient evidence to support the court's findings. He asks us to review the denial of his petition de novo because there was no live testimony, and he alternatively contends there was not substantial evidence to support the court's factual conclusions. He also argues the court erred in its analysis of whether he acted with a reckless indifference to human life because the court did not consider his youth at the time of the crime.

We conclude the proper standard of review is substantial evidence, and we find that substantial evidence supports the trial court's conclusion that Oryall acted as an aider or abettor with intent to kill, and we affirm the court's ruling on that basis. We do not reach the issue of whether there is substantial evidence to support the theory that Oryall was a major participant who acted with reckless indifference because the court reasonably denied the petition on the alternative ground. For this reason, we likewise

[1]    Further statutory references are to the Penal Code.

[2]    Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.

make no determination as to the impact of the court's failure to consider Oryall's youth as it assessed whether Oryall acted with reckless indifference to human life.

## I.

## BACKGROUND AND PROCEDURAL FACTS

In September 1983, Oryall pled guilty to second degree murder (§ 187) and admitted to being armed with a firearm in the commission or attempted commission of a felony (§ 12022, subd. (a)), specifically admitting he "committ[ed] a felony resulting in the killing of a human being while armed with a rifle." The court sentenced him to 15 years to life plus one year for the enhancement, initially housed in the California Youth Authority.

In February 2019, Oryall filed a petition for resentencing pursuant to section 1172.6. The court appointed counsel, set a briefing schedule, and eventually ordered an evidentiary hearing under section 1172.6, subdivision (d)(3).

The trial court considered the documents provided by the parties, including the published opinion *People v. Crenshaw* (1986) 177 Cal.App.3d 259 (*Crenshaw*), a forensic psychological report by Dr. Kristina Malek, the preliminary hearing, the change of plea, parole hearings, and probation reports.[3]

### A. *Crenshaw*

The following facts appear in *Crenshaw*, *supra*, 177 Cal.App.3d 259 at pages 261 through 262:

"On February 5, 1983, Oceanside police officers went to a tomato field near the San Luis Rey River to investigate reports of multiple gunshot

---

[3]    Although the trial court suggested it had admitted statements from parole hearings, those documents are not in the record before us.

victims.  Four victims were found in the area and taken to the hospital.  Two were dead on arrival, another was in very critical condition and the fourth in stable condition.  All four were young (late teens to early twenties) undocumented Mexican farmworkers camping in the vicinity of the river bottom.  The police later searched the area where the shootings occurred and found numerous bloody trails and blood spots where the victims had either stopped, or tripped and fallen in the course of attempting to flee from the ambush.  The police also found 11 spent .22 caliber casings behind some bushes where the weapon had been fired.

"The least injured victim told investigating officers he and his companions left their encampment to cross the river to a 7-Eleven store in a residential area.  After they crossed the river, shots were fired.  He saw a 'white man' kneeling while holding a rifle to his face and firing it in rapid succession.  He was hit in the leg by a bullet but kept running away from the gunman.  While fleeing, he observed three male Caucasians entering a parked vehicle and saw one of them place what he believed to be a rifle in the driver's seat before driving away.

"The two deceased victims fell about 500 feet from each other.  One had been shot twice in the back; the other had suffered one gunshot wound entering his left side and passing through his entire body to the right side.

"One surviving victim suffered a leg wound to the right thigh.  The other suffered from two gunshot wounds, one to the back and the second to the rear of his neck.  The round entering his back perforated his colon.  The second round passed through the back of his head and came out near his right cheek bone.  He was, for a time, considered in critical condition.

"Following his arrest, Crenshaw was interviewed and admitted accompanying Oryall and a juvenile coparticipant to the crime scene on the

4

afternoon of February 5, 1983. He said they went to the field planning to rob undocumented Mexicans. Crenshaw admitted shooting at least one of the farmworkers; he said Oryall shot the remaining victims."

## B. *Recorded Police Interview*

Oryall told officers he owned the .22 caliber long rifle, which was a semiautomatic weapon that held 19 bullets. He and Crenshaw each carried half the rifle across the river before Crenshaw took the weapon. Oryall also had a hunting knife and a pocket knife on him.

Oryall explained their plan had been to go and ask the farmworkers for their money. He brought the rifle because the minor, B.S., had asked him to. He denied planning to shoot the workers, but he told the officers that when Crenshaw shared he planned to shoot the workers, Oryall told Crenshaw, "[F]ine, you get caught, you get caught." Oryall had never seen Crenshaw shoot a gun; however, he knew Crenshaw was going to shoot the Mexican workers. He believed he could not do anything about it.

Oryall told police he and B.S. were in some bushes, about 25 feet away from Crenshaw, when he heard gun shots. Crenshaw, B.S., and Oryall all took off running, and as he passed one of the victims, B.S. handed him the gun. He denied firing the weapon that day.

Oryall did not contact the police or an ambulance. When he arrived home, he changed out of his clothes.

## C. *Preliminary Hearing*

At the preliminary hearing, Oceanside detective Ian Johnston testified about his interviews of Oryall. He told the court that as Oryall, Crenshaw, and B.S. drove from one side of the area to the other, they talked openly about the potential robbery and shooting.

Oryall had learned the phrase "Dinaro di morto," which he believed meant "money or die," an expression he planned to use during the robbery.

At one point, Oryall told Crenshaw, "[I]f you shoot them or blow them away, I'm not going to take the murder rap for you."

Once they ran from the scene, they placed the gun in the trunk of the vehicle, then left it at B.S.'s house.

## D. *Probation Report*

The probation report incorporated information summarizing materials taken from the district attorney's file, including crime and investigative reports, as well as information from an interview with Oryall. B.S. had reported that he and Oryall had each fired the weapon into the ground once before loading it with 19 shells. He and Oryall were supposed to hide in the bushes and jump out if any victims started to come toward them. Crenshaw told police he handed the weapon to Oryall after observing one of the victims fall.

The probation officer also reported that Oryall denied shooting anyone but "admitted that there had been discussion about shooting the intended victims in the legs" and said he had previously burglarized the huts where the farm workers lived when no one was there. Because he had burglarized the huts before, he was familiar with the area, and he gave the others directions to the location. Like B.S., Oryall admitted that they had obscured themselves to surprise and intercept their victims.

## E. *Denial of Resentencing*

The court denied Oryall's request. In reaching its conclusion, the court acted as an independent factfinder and assessed whether the People had proved beyond a reasonable doubt that Oryall was the actual killer; not the actual killer but a person who acted with the intent to kill and aided, abetted,

6

counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of the murder; or a major participant in the underlying felony who acted with a reckless indifference to human life. (See § 189, subd. (e).)

The court concluded that the People proved beyond a reasonable doubt that Oryall "aided and abetted the actual killer with malice aforethought and the intent to kill." It also evaluated the factors detailed in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and concluded Oryall was "a major participant in the attempted robbery and shooting that led to the death of the victims," and that he "acted with reckless indifference to human life."

The court had "no dispute or disagreement with the science" in Dr. Malek's report and "recognize[d] that [Oryall]'s immaturity may have played a role in the commission of the offense," but it concluded that "this issue, or status, [is] not part of an analysis of the validity of a conviction within the meaning of [section 1172.6]." It also noted that the matter had been filed as a juvenile delinquency petition before being remanded to adult criminal court. The court stated that Oryall could see the benefit of his youth at the time of offense at his next youthful offender parole hearing.

Oryall timely appealed.

## II.
## DISCUSSION
### A. *Senate Bill No. 1437*

Effective January 1, 2019, Senate Bill No. 1437 (Senate Bill 1437) eliminated liability for murder under the felony murder and natural and probable consequences doctrines. (§§ 188, subd. (a)(3) & 189, subd. (e); *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147 (*Anthony*).)

7

Senate Bill 1437 addressed aspects of felony murder and the natural and probable consequences doctrine, "redefin[ing] 'malice' in section 188. Now, to be convicted of murder, a principal must act with malice aforethought; malice can no long 'be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).)" (*In re R.G.* (2019) 35 Cal.App.5th 141, 144.) Senate Bill 1437 also amended section 189 by adding subdivision (e), which states that a participant in the target felony who did not actually commit a killing is nonetheless liable for murder if he or she aided, abetted, or assisted the actual killer in murder or was a major participant in the target crime and acted with reckless indifference to human life. (§ 189, subd. (e)(2)-(3).) The result is that Senate Bill 1437 "ensure[s] that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Anthony*, *supra*, 32 Cal.App.5th at p. 1147.)

Section 1172.6, subdivision (c) provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

When a trial court reviews a petition for resentencing, the court first determines if the petitioner has shown a prima facie case for relief under the statute.  The court may deny the petition if the person is ineligible as a matter of law.  (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980-981.)  If the petitioner meets the prima facie burden, the court must issue an order to show cause and hold an evidentiary hearing on the petition.  (§ 1172.6, subds. (c) & (d)(1); *People v. Lewis* (2021) 11 Cal.5th 952, 962.)  At this stage of the proceeding, the prosecution has the burden of proving "beyond a reasonable doubt[ ] that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); *People v. Martinez* (2019) 31 Cal.App.5th 719, 723-724.)

## B.  *Standard of Review*

Oryall asks us to review the trial court's petition denial de novo because the trial court's factual findings were based on a cold record.  To support his request, Oryall primarily relies on *People v. Vivar* (2021) 11 Cal.5th 510, 524 (*Vivar*).

In *Vivar*, *supra*, 11 Cal.5th 510, the defendant filed a motion to vacate his plea-based conviction under section 1473.7, which provided relief upon a "showing, by a preponderance of the evidence, of a *prejudicial* error that affected a defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea."  (*Vivar*, at p. 517; § 1473.7, subds. (a)(1), (e)(1).)  The Supreme Court compared its review under section 1473.7, subdivision (a)(1) to a review of claims on habeas corpus, noting that independent review was supported by "the profound and substantial consequences of a prejudicial misadvisement on a defendant's life."  (*Vivar*, at pp. 524, 525.)

Its decision did not turn on the nature of the evidence, as Oryall proposes here.  The court considered the rights at stake, explaining that the purpose of section 1473.7 was "to offer relief to those persons who suffered 'prejudicial error' but are 'no longer imprisoned or restrained' and for that reason alone are unable to pursue relief on habeas corpus." (*Vivar*, *supra*, 11 Cal.5th at p. 525.)  It noted that it had adopted an independent review due to "multiple factors with special relevance here:  the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Id.* at p. 527.)  Further, the court explained that "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law." (*Id.* at p. 524.)

As our colleagues in the Fourth Appellate District, Division Two point out, the questions we face on a review from a court's denial of a section 1172.6 motion are primarily factual.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 301 (*Clements*).)  Unlike the court in *Vivar,* we are not considering predominantly questions of law, and the factors that persuaded the court in *Vivar* to apply independent review are not at play here.

The other case law offered by Oryall is likewise inapposite.  It addresses situations in which jurors were dismissed for cause based solely on documentary evidence (*People v. McKinnon* (2011) 52 Cal.4th 610, 647 [questionnaire]; *People v. Thompson* (2010) 49 Cal.4th 79, 100 [questionnaire]; *People v. Stewart* (2004) 33 Cal.4th 425, 451 [documents with marks and handwritten comments]), the governor's denial of parole (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677), and review of a referee's resolution

of mixed questions of law and fact in a petition for habeas corpus (*In re Cudjo* (1999) 20 Cal.4th 673, 688). None of these situations are akin to resentencing.

Further, in the context of Proposition 36, which narrowed the class of third-strike felonies for which an indeterminate sentence can be imposed and permits inmates convicted of nonserious, nonviolent felonies under the Three Strike law to petition for resentencing (§ 1170.126, subd. (f)), our Supreme Court has held the substantial evidence standard of review applies. (*People v. Perez* (2018) 4 Cal.5th 1055, 1066.) The court noted that "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such findings." (*Ibid.*) Thus, like the court in *Clements,* we conclude the proper standard of review is substantial evidence. (See *Clements*, *supra*, 75 Cal.App.5th at p. 301; see also *People v. Garrison* (2021) 73 Cal.App.5th 735, 747; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*); *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320 [review of trial court's fact finding for substantial evidence].)

When we conduct a review for sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *Banks*, *supra*, 61 Cal.4th at p. 804), and we do not substitute our own factual determinations for the factfinder's (*Koontz*, at p. 1078).

11

### C. *Aiding and Abetting Principles*

Guilt as a direct aider and abettor requires: (1) knowledge of the direct perpetrator's intent to commit the crime; (2) intent to assist in committing the crime; and (3) conduct that in fact assists in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225-1226; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118 (*McCoy*).) The defendant must not only know the direct perpetrator's intent, he or she must share that intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 560; *McCoy*, at p. 1118.)

Senate Bill 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' " (*People v. Offley* (2020) 48 Cal.App.5th 588, 595-596.) "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Id.* at p. 596.)

Intent to kill can be demonstrated through express or implied malice. Intent to kill for purposes of murder, also known as express malice, is shown when the assailant either desires the death or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Smith* (2005) 37 Cal.4th 733, 739; *In re M.S.* (2019) 32 Cal.App.5th 1177, 1185.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*In re M.S.*, at p. 1185.) The mental state required for implied malice murder, which suffices to deny a section 1172.6 petition under the amended section 188 (see *People v. Soto* (2020) 51 Cal.App.5th 1043, 1057), represents a lower standard than intent to kill (*People v. Swain* (1996) 12 Cal.4th 593, 602; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1379 ["the specific intent necessary for conviction of an aider and abettor in a murder would not be the specific intent to kill, but the intent to 'encourage and bring about conduct

that is criminal' "]).  Implied malice murder requires knowledge that conduct endangers the life of another and a conscious disregard for life.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Under the direct aiding and abetting theory, an aider and abettor's mental state must be at least that required of the direct perpetrator.  " 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ' " (*McCoy, supra*, 25 Cal.4th at p. 1118.)  It follows that the direct aider and abettor must intentionally commit, encourage, or facilitate life-endangering conduct with knowledge of the perpetrator's purpose and conscious disregard for life. (*Id.* at p. 1118 & fn. 1.)

Oryall concedes he provided the rifle used and that a member of his group planned to say "money or die" while robbing the migrant workers, but he contends this merely demonstrates an intention to participate in or aid and abet a robbery.  He denies harboring any intent to kill and suggests the evidence demonstrates he provided the gun only to use in a robbery, with no plan to shoot at migrants.  He argues that there was evidence that he wanted nothing to do with shooting immigrants, and therefore, he did not agree with Crenshaw's plan.  He further maintains that his flight from the scene without providing assistance does not demonstrate aiding and abetting; it was justified by his fear of being charged with murder.

However, ample evidence supports a conclusion that he aided and abetted murder by facilitating life-endangering conduct with knowledge of the perpetrator's conscious disregard for life.  (See *McCoy, supra*, 25 Cal.4th at p. 1118 & fn.1.)  Specifically, Oryall had conducted burglaries of the huts

13

in which the migrant workers lived when they were not present, so he guided the group to the location where the shooting took place. Instead of burglarizing the huts, the group planned to tell the workers "money or die," demonstrating their intent to directly confront the migrants. Further, Oryall brought his rifle and helped physically prepare it for use by firing a round into the ground before loading it with 19 shells and eventually handing it to Crenshaw.

There was evidence that Oryall knew Crenshaw was going to shoot at the migrants before the group arrived at their location. Oryall admitted to the probation officer that there had been discussion about shooting the intended victims in the legs. Additionally, Detective Johnston testified at the preliminary hearing that Oryall had told Crenshaw, "[I]f you shoot them or blow them away, I'm not going to take the murder rap for you." Moreover, in his recorded interview with police, Oryall said he told Crenshaw, "Fine, you get caught, you get caught." These statements demonstrate his knowledge of Crenshaw's intent to shoot at the migrants, not simply to commit robbery.

B.S. told police he and Oryall had hidden in the bushes so that they could stop any of the migrants if the migrants fled toward them. Oryall told police he would not have harmed the migrants had they run toward him, but he also admitted to the probation officer that he and B.S. had obscured themselves to surprise and intercept victims. These acts demonstrate Oryall's intent to assist Crenshaw as he fired upon the workers because it shows Oryall's role during the crime was to physically engage with the workers in support of Crenshaw's goals.

Oryall had knowledge about Crenshaw's plan, but he nonetheless supplied the rifle, decided not to walk away or ask for his gun back, hid in the bushes to help ambush the migrant workers as necessary, and then helped

14

hide the rifle and failed to report the shootings to police.  In short, there is sufficient evidence to show that Oryall knew about Crenshaw's criminal purpose and that he intended to facilitate Crenshaw's conduct—and actually did so.  (See *McCoy*, *supra*, 25 Cal.4th at p. 1118.)  Thus, substantial evidence supports the trial court's denial of the petition for resentencing.

D.  *Major Participant Who Acted with Reckless Indifference*

Oryall also contends the record lacks substantial evidence to support the court's finding that he was a major participant who acted with a reckless disregard for human life.  In connection with this argument, he maintains the court abused its discretion by failing to sufficiently consider the role his youthful age played at the time of his crime.

Because we have already concluded there was substantial evidence to support the trial court's denial of Oryall's section 1172.6 petition based on his role as a direct aider and abettor, we need not evaluate whether substantial evidence also supports the alternative finding that Oryall was a major participant who acted with a reckless indifference to human life.

We note that recent case law indicates youth is a factor courts must consider when evaluating whether a minor defendant has acted with reckless indifference to human life.  (*People v. Harris* (2021) 60 Cal.App.5th 939, 960-961, review granted Apr. 28, 2021, S267802 (*Harris*) [recognizing science regarding adolescent brain development and considering defendant's youth]; *Ramirez, supra*, 71 Cal.App.5th at p. 991 [remanding matter for failure to consider defendant's youth and finding insufficient evidence to prove 15-year old was " 'subjectively aware that his actions created a graver risk of death' than any other armed carjacking"]; *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*) [holding "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life"]; see

also *In re Harper* (2022) 76 Cal.App.5th 450, 467-470 (*Harper*) [assuming without deciding youth is a factor in evaluating reckless indifference but explaining it was not a decisive factor].)[4]

However, we also note that the record before us does not develop this factor, even though Oryall's attorney asked the court to consider it. The charges against Oryall were initially brought before the California Youth Authority, where questions of youth and maturity were considered before the matter was transferred to adult criminal court. Beyond that piece of information, and the defendant's chronological age (16), there is little that specifically addresses Oryall's youth and maturity at the time of the crime. Even Dr. Malek's report is not specific to Oryall. Thus, even assuming youth is a factor for the court to consider, and even recognizing the court declined to do so here, its impact here is unclear. Regardless, as we detailed *ante*, there is abundant evidence for the court to reasonably conclude Oryall was guilty beyond a reasonable doubt under the direct aider and abettor legal theory.

---

[4] These cases all considered whether the defendants acted with reckless indifference to human life, but *Harris* and *Ramirez* did so in the context of section 1172.6 petitions for resentencing (*Harris, supra,* 60 Cal.App.5th at p. 956, review granted; *Ramirez, supra,* 71 Cal.App.5th at p. 981)*,* while *Moore* and *Harper* did so in reviews of petitions for habeas corpus (*Moore, supra,* 68 Cal.App.5th at pp. 453-454; *Harper, supra,* 76 Cal.App.5th at pp. 466-467).

In addition, applying its holding that a defendant's youth is a relevant factor for determining whether a defendant acted with reckless indifference, the court in *Moore* explained that even if the evidence supporting the *Clark* factors supported a finding of reckless indifference for an adult, it was not sufficient to establish that 16-year-old Moore had the requisite mental state because of immaturity. (*Moore, supra,* 68 Cal.App.5th at p. 453.) In its review of *Moore,* the court in *Harper* noted that if being youthful were a relevant factor in evaluating whether a perpetrator acted with reckless indifference to human life, it was not a decisive factor. (*Harper, supra,* 76 Cal.App.5th at pp. 467-470.)

16

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.

17