Filed 12/23/25  P. v. Goodwin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AUTUMN BROOKE GOODWIN,<br><br>    Defendant and Appellant. | D086605<br><br><br>(Super. Ct. No. BAF2301021) |

APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Singerton, Judge.  Affirmed.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

Shortly after midnight on September 18, 2023, Shawna Rhoades was stabbed to death outside her apartment complex when she, her husband, and several of their friends encountered a group of people—including Autumn

Brooke Goodwin—in and around a recreational vehicle. A jury convicted Goodwin of first degree murder and found true the allegation she personally used a knife. Goodwin raises four claims on appeal.

First, Goodwin argues the trial court abused its discretion when it allowed the jury to hear evidence concerning her conviction for a 2015 assault with a deadly weapon—also a knife—for the limited purpose of establishing intent and the absence of accident or mistake. We conclude the court acted within its discretion in admitting the evidence for that purpose.

Second, Goodwin claims insufficient evidence supports the jury's finding she acted with the intent to kill. Yet the record—including statements from witnesses and Rhoades' stab wounds—substantiates Goodwin's lethal intent.

Third, Goodwin contends the trial court improperly limited her counsel's cross-examination of several prosecution witnesses. We, however, determine the prosecutor's objections were properly sustained and those rulings did not prevent further proper cross-examination.

Finally, Goodwin argues the court violated her constitutional rights by sanctioning her wearing of a nonvisible leg restraint throughout the trial. We agree, but we conclude the error was harmless on this record.

Accordingly, we affirm.

I.

A.

On the evening of September 17, 2023, Rhoades, her husband, and several friends went to a bar to celebrate Rhoades' husband's birthday. They returned to Rhoades' apartment, intoxicated, at around midnight. Nearly everyone left except their friend Allison Sager and one of Rhoades' husband's friends.

2

Either that same evening or several days prior, Donald Doty used his truck to tow an RV to the street in front of Rhoades' apartment. The RV belonged to Doty's son's friend, Sonya Aranda.

The evening of September 17 and into the early morning hours of September 18, Aranda, Doty, Doty's son, and Aranda's close friend Gary Simon were hanging out in or near the RV. A friend of Aranda's known as Dopey drove over to hang out with them and parked his car behind the RV. Goodwin walked by, and Doty and his son invited her to hang out, too.

Shortly after most of their guests left, Rhoades' husband and his friend stepped outside the apartment to smoke and saw the RV, which was parked 25 to 30 feet away. They saw people "fiddling around with lights and stuff" both inside and outside of the RV and "doing drugs inside." Rhoades' husband yelled for them to "get the fuck out of here, quit doing your drugs around my kids."

B.

What happened next is disputed but ended in Rhoades' death.

1.

According to Rhoades' husband, a man and a woman were standing outside the pedestrian gate when he yelled at them from within the fence surrounding the apartment complex. Initially they were 15 to 20 feet away, but Rhoades' husband approached them. The other people began arguing, and the altercation—which lasted five to ten minutes—got louder. Rhoades' husband tried to climb over the fence but could not.

Rhoades' husband saw Rhoades run through the pedestrian gate towards the altercation, so he began to run toward her "[f]or her safety." He could not see where she went, although he "knew where she was going."

3

About 30 to 45 seconds later, Rhoades' husband saw Rhoades slowly walking back, "holding her stomach" and "saying 'they stabbed me.'" He could see "her whole abdomen was covered in" blood. She collapsed outside the gate, and her husband "picked her up and helped her walk in" the gate. Rhoades was "[b]arely" able to walk. She collapsed again on the grass, and Rhoades' husband "started asking everybody to call 911."

2.

According to Rhoades' friend Sager, from inside the apartment she and Rhoades could hear Rhoades' husband yelling and someone yelling back. They went outside to see what was happening. Rhoades was unarmed.

Rhoades' husband was standing at the fence while a man on the other side was hitting the fence with a bar. Sager was focused on this confrontation and missed seeing Rhoades run through the gate, although she heard Rhoades telling the people associated with the RV to leave. Sager saw Rhoades by Doty's truck telling what she believed to be another woman to leave and saw Rhoades start hitting her. Sager walked away.

3.

According to Doty—who had shoulder-length hair at the time— he, his son, and Goodwin were sitting in the RV's living area, talking, when his son left to go outside. After his son exited, Doty "heard some screaming going on outside, and didn't pay too much attention to it at first." Simon exited the RV. When the noise continued, Doty also exited to see what was happening.

Doty saw "a man screaming" at Simon from the other side of the fence separating the apartment complex from the sidewalk, saying the RV was "a problem." Aranda was outside, too, standing near Simon. She stayed in that area the whole time.

4

Doty said he would move the RV and began to hook it up to his truck. While Doty was doing so, Rhoades approached him, chest-bumped him, screamed "she wanted the RV out of there," and pushed him. Doty was "caught . . . off guard" but not intimidated. When Rhoades tried to come at him again, Doty pushed her away. Doty then heard Goodwin say to "'[l]eave him the fuck alone.'" Rhoades "turned and headed straight for" Goodwin. Doty briefly saw them "in a hug," "holding" each other. He also heard someone say, "'ow.'"

Once Doty saw his son was in the RV's driver's seat, he entered his truck to drive off. But he heard Goodwin behind him saying, "let me in. Let me in." He let her in, and they drove off. From the time Goodwin said to leave Doty alone until she asked him to let her in, less than a minute had passed.

Doty drove the RV to Aranda's house and left it there. Afterward, he dropped Goodwin off nearby.

4.

According to Doty's son, he was "[h]anging out and talking" in the RV when he went outside to have a cigarette and relieve himself. While he was lighting his cigarette, some men behind the fence began yelling at him to leave. After exchanging some words, he went back to the RV and told the others they all had to go. He went to the driver's seat to steer the RV while his father towed it.

Doty's son could hear Simon, Aranda, and the man who had yelled at him yelling at each other. He saw Rhoades "come running up behind the RV, and come straight and shove [his] dad," but he did not think his dad was in danger. She yelled at them to leave and pushed Doty again. Outside, Goodwin said to leave Doty alone.

5

Doty's son looked to make sure the RV door was closed. By then he saw his father and Goodwin in the truck and they drove away.

An hour or two before, Aranda had borrowed Doty's son's knife and did not return it.

5.

According to Simon, while he was in the RV's back bedroom with Aranda and Dopey, he heard Rhoades' husband yelling. Simon thought he was throwing things at the RV because "there w[ere] knocks or bangs." Simon went outside to see what was happening.

He "could clearly tell that [Rhoades' husband was] drunk." At first Simon tried to reason with him, but Rhoades' husband "wasn't giving [him] the opportunity to talk." So Simon started yelling, too, several feet from the fence.

When Rhoades' husband punched the fence and tried to jump it, Simon "stepped up" "to try to scare him and deter him," and Rhoades' husband backed off. Simon went back to the RV and grabbed a fire extinguisher to spray Rhoades' husband with, but it "was a dud."

Simon heard Doty being attacked, at which point "[Goodwin] came out of the RV" and headed toward Doty. Simon turned around briefly and saw Rhoades "assaulting" Doty, with her "fists going to [his] face." Doty was trying to block the punches. This tussle went on for "a minute or two."

Simon then saw Goodwin "confront[ing]" Rhoades. Goodwin was "punching her, or . . . jabbing her toward the stomach." Though Simon could not see if Goodwin had anything in her hands, she was jabbing toward Rhoades' lower left abdomen.

Simon saw Goodwin run off. He also saw Rhoades walking back toward the gate, "hunched over" with "her hands on her stomach area."

6

Aranda and Dopey exited the RV only after Rhoades was already walking back toward the fence.  Aranda and Dopey went to drive off in Dopey's car, but they could not find the keys.  Aranda then came up to Simon and said she had heard someone say either they had a gun or to grab a gun, so she wanted to "get the hell out of here."

Simon and Aranda walked quickly toward a nearby gas station.  Simon opened the door and stood on the threshold of the store without going inside.

Simon denied having blood on his shirt after the incident or throwing away his shirt.

6.

According to Aranda, while she, Simon, and Dopey were smoking methamphetamine in the back of the RV, she heard "large objects hitting the windows" and a "confrontation outside."  She looked through the window and saw people "screaming . . . at the RV."  She heard Goodwin say "something about a knife," "asking if anybody had one" or whether there was one.  Aranda did not, however, see anyone hand Goodwin a knife.

Everyone exited the RV except Aranda, who was looking for her purse so she could get Dopey's keys for them to drive away.  She exited once she found her purse and continued to look in it for the keys.  She stayed close to Simon, who was physically fighting Rhoades' husband through the gate.

Rhoades said she would "fuck [Aranda] up."  Aranda also heard her say something about going to "get the gun."  Aranda told Simon they should get out of there.  Rhoades ran off, and Aranda did not know where she went.

Aranda, Simon, and Dopey headed toward Dopey's car, still trying to find the keys.  They heard a "commotion" on the other side of the RV—both male and female voices yelling and screaming.  Aranda felt "someone behind" her "running" and thought it was Goodwin.  Aranda said, "Hey, Babe, do you

7

need a ride?," because Goodwin looked "concerned, worried."  But Goodwin just kept running.

Aranda gave up on finding the keys, so she, Simon, and Dopey ran until a man asked if they needed help.  They did not go to the gas station.  Aranda did not see anything happen between Goodwin and Rhoades.  She did, however, see Rhoades "limping" and "physically holding . . . her stomach."

Aranda had a pocketknife with her that evening as she always does, though she denied stabbing anyone.  She did not have Doty's son's knife.

When initially questioned by law enforcement, Aranda told a detective she saw Simon with blood on his shirt and that he threw the shirt away.  At trial, she did not recall these things.

7.

Several neighbors witnessed portions of the deadly altercation.

The first witness lived in the apartment complex. She was awoken by "a commotion outside [her] window."  She heard someone say something about a gun.  The witness looked out the window without putting on her eyeglasses and saw some seemingly drunk people fighting along the sidewalk.  She laid down to go back to sleep, but looked out the window again when the fighting continued and saw what she thought were two women in the street "arguing and fighting."  She saw someone trying to pull one woman off the other.  The witness laid down again, heard a loud noise, and looked out the window again to see "someone . . . getting into a vehicle" and the truck driving off with the RV behind it.

The second witness also lived in the apartment complex and was awoken by "yelling and arguing."  She—also without putting on her eyeglasses—looked out her window and saw Rhoades run past her window, exit the gate, and run down the sidewalk to somewhere outside her line of

8

vision. Thirty seconds later she heard a man say, "No [Goodwin]. No [Goodwin]." About a minute later, the witness saw Rhoades running back toward the gate and her husband running to meet her. At first Rhoades moved normally but then began to stagger. The witness saw what appeared to be a man holding a gun on the sidewalk outside the fence following Rhoades and saying he was "going to kill you, motherfucker." The witness then heard a "very loud boom" and called the police. Rhoades collapsed in front of the witness' apartment.

## C.

### 1.

Law enforcement arrived in response to a "shots fired call." The first responding officer was directed to a grassy area inside the fence, where Rhoades was lying unresponsive. Although the officer found no pulse, he and another officer started CPR. The fire department took over, and Rhoades was taken to the hospital.

Law enforcement taped off a portion of the street. There was blood spatter on the sidewalk and a blood trail leading back to the apartment building.

Surveillance video from the gas station showed Aranda, Simon, and Dopey go into the gas station parking lot after the incident. The video did not show Goodwin running away.

### 2.

According to the forensic pathologist, Rhoades' cause of death was multiple stab wounds. Specifically, Rhoades had at least three stab wounds to her front—one to the left side of her chest just under her breast, one to her lower left abdomen, and one to her lower right abdomen. Rhoades also

9

suffered two stab wounds to the back—one to the left midback and one to the left lower back.

The right ventricle of Rhoades' heart had a one-inch defect consistent with a stab wound. Rhoades also had defects to her small bowel, iliac artery, and the distal aspect of the inferior vena cava.

3.

Several days after the stabbing, law enforcement arrested Goodwin at a third party's home. The third party had been allowing Goodwin to spend the occasional night there for the prior month or so.

A few days later, the third party discovered what looked like a handle in a used can of paint in the laundry room. Thinking the object could be connected to Goodwin's arrest, the third party called law enforcement. Law enforcement processed the paint can and discovered another half of a handle and a pocket clip. No blade was recovered.

D.

At trial, the above evidence was presented to the jury. Over Goodwin's objection, the jury also received evidence concerning a 2015 stabbing to which Goodwin pled guilty.

Goodwin elected not to testify, and the defense presented no affirmative defense. During closing arguments, defense counsel argued the evidence was insufficient for the jury to find Goodwin guilty, the evidence favored Aranda as the stabber, and—to the extent the jury found Goodwin stabbed Rhoades—she did so in defense of herself or Doty.

The jury convicted Goodwin of first degree murder and found true the allegation she personally used a knife. Goodwin was sentenced to a prison term of 25 years to life consecutive to one year for the personal use allegation.

10

II.

A.

Goodwin argues the trial court erroneously admitted evidence of her prior assault conviction. We conclude otherwise.

1.

Over Goodwin's objection, the People sought to admit, under Evidence Code section 1101(b), evidence concerning Goodwin's prior conviction for assault with a deadly weapon—also a knife.

According to the victim, early one morning in 2015, he was inside his house when he heard two people arguing in his driveway. Thinking they were trying to break into his car, he went outside "to see what the issue was." He told the pair—Goodwin and presumably her boyfriend—to "'[g]et the fuck out of here.'"

The boyfriend ran up to the victim and "engaged in a fight." The victim was winning when the boyfriend yelled, "'Stab him, babe.'" Goodwin then stabbed the victim in the back about nine times. She and her boyfriend ran away, a neighbor called 911, and the victim was transported to the hospital.

The parties stipulated that were the police officer who took the victim's statement to testify, he would say the victim told him (1) Goodwin stabbed him, (2) the victim then punched Goodwin and knocked her out, and (3) the boyfriend subsequently picked up the knife and stabbed him.

Defense counsel argued the eight-year-old conviction was remote, no correlation existed between the crimes given the prior conviction was not premeditated and an intent to kill was never charged or proven, and "the only thing this [prior act] would show is propensity."

The court concluded the prior conviction was "highly probative" given Goodwin was in part claiming self-defense or defense of another, making

11

intent "really the primary issue." The two incidents involved "the same kind of act." The court noted "there's nothing in [section] 1101[(b)] or in any case law that I found that requires that the prior incident also have the intent to kill . . . . The essence is the [prosecutor] is using the prior incident to show there's an intent here."

The court also found the evidence not inadmissible under section 352. It noted the jury was unlikely to confuse the two incidents, the evidence would not unduly consume trial time, and the jury would not seek to punish Goodwin for the prior incident because she already pled guilty to it. The court further noted the jury would be instructed the evidence was admitted for a limited purpose.

The court therefore admitted the evidence. It also instructed the jurors that they could "consider that evidence for the limited purpose of deciding whether [Goodwin] acted with the required intent to kill in this case or [whether Goodwin's] alleged actions were not the result of mistake or accident." (CALCRIM No. 375.)

2.

Evidence of a person's character is, subject to inapplicable exceptions, inadmissible to prove the person's propensity to commit a crime, but such evidence is admissible "when relevant to prove some [other] fact (such as . . . intent . . . [or] absence of mistake or accident)." (Evid. Code, § 1101(b).) Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Prejudice "is not synonymous with 'damaging,' but refers instead to evidence that uniquely tends to evoke an emotional bias against [a] defendant without

12

regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 [cleaned up].)

"We review a trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion." (*People v. Thomas* (2023) 14 Cal.5th 327, 358.) It is a defendant's burden to show "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [cleaned up].)

3.

Goodwin claims evidence of her prior assault conviction was inadmissible for purposes of showing intent or absence of mistake or accident and was instead improperly admitted to show propensity. We disagree.

According to Goodwin, the prior assault was inadmissible because the law requires the offense underlying the prior conviction to share the same intent as the charged offense. Because it was never proven she had an intent to kill in 2015, she contends that incident was irrelevant to her first degree murder charge. And while Goodwin admits prior assaults may sometimes be admitted to prove intent to kill, she claims cases in which such evidence has been found admissible are distinguishable, as they "involve an identical perpetrator and victim."

Not so, as *People v. Whisenhunt* (2008) 44 Cal.4th 174 demonstrates. There, the defendant was convicted of first degree murder of his girlfriend's year-and-a-half old baby, who died of burns and internal injuries. (*Id.* at p. 181.) The *Whisenhunt* defendant claimed he never struck the victim and instead blamed his girlfriend for the baby's death. (*Id.* at p. 191.) Over the defendant's objection, his former romantic partner testified that when their children were one to three years old, the defendant hit and kicked them at

13

least weekly when they whined or misbehaved. (*Id.* at pp. 189, 203.) On appeal, the defendant claimed this evidence was improperly admitted under sections 1101(b) and 352. (*Id.* at p. 203.) He argued the earlier abuse evidence was irrelevant to intent because it "showed neither premeditation, intent to kill, nor intent to torture." (*Id.* at p. 204.) He also claimed the evidence was irrelevant because he never claimed accident as a defense. (*Ibid.*)

The Supreme Court disagreed. In this context, "'intent' and 'absence of accident' merely reflect[] two ways of describing the same relevant issue, namely, that defendant performed the acts that killed [the victim] intentionally rather than accidentally." (*Whisenhunt*, 44 Cal.4th at p. 204.) Because "a defendant's plea of not guilty puts in issue all the elements of the charged offense," the prosecution bears the "burden of proving all the elements of the charged offense[]," including "the threshold showing that the acts that caused [the victim]'s death were performed intentionally rather than accidentally." (*Ibid.*) Although evidence of other crimes is "[c]ertainly" admissible to establish absence of accident where the defendant "denies the necessary intent for the charged crime because of mistake or accident," the Supreme Court "ha[s] never limited evidence of absence of accident to such instances." (*Ibid.*) Accordingly, the evidence was admissible under section 1101(b). Moreover, the trial court did not abuse its discretion under section 352 because the prior crimes evidence was less inflammatory and incidents from seven to ten years before the date of the charged offense were not too remote in time. (*Id.* at pp. 204-205.)

Goodwin, like the *Whisenhunt* defendant, neither raised accident as a defense nor stipulated that Rhoades' injuries were intentionally inflicted, which kept the threshold showing that the lethal injuries were inflicted

14

purposefully rather than accidentally at issue. (*Whisenhunt*, 44 Cal.4th at p. 204.) Goodwin, like the *Whisenhunt* defendant, argued someone else was responsible. But "'[t]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) The fact Goodwin previously engaged in a knife fight and pled guilty to assault with a deadly weapon was thus probative to the jury's determination of whether Goodwin intentionally stabbed Rhoades.

Goodwin relies heavily upon *People v. Williams* (2018) 23 Cal.App.5th 396 to argue the prior offense bore insufficient similarities to the charged offense to be probative of Goodwin's intent in stabbing Rhoades. But *Williams* is distinguishable. There, the defendant was convicted of first degree murder for killing his wife by stabbing her in the neck while they were in their van using drugs and listening to music. (*Id.* at pp. 400, 418.) The trial court had allowed evidence of the defendant's 23-year-old prior conviction for shooting his mother-in-law with intent to kill when she intervened in an altercation with his estranged wife for the purpose of determining, among other things, intent to kill and absence of mistake. (*Id.* at pp. 400, 413.) The court of appeal concluded, however, that "[a]part from the fact that a troubled marriage was involved in both cases, they are completely different kinds of incidents." (*Id.* at p. 420.)

Unlike in *Williams*, the incidents here are strikingly similar. In each, Goodwin attacked a person who was assaulting someone known to her with a knife, stabbing the attacker in the back multiple times. As "'[t]he least degree of similarity (between the uncharged act and the charged offense) is

15

required in order to prove intent'" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328), the court did not abuse its discretion in concluding evidence of the 2015 stabbing was probative of Goodwin's intent and the absence of mistake or accident.

Nor did the court err in determining the probative value of the prior act was not substantially outweighed by prejudice. The evidence of the prior stabbing was neither more inflammatory than that of the charged crime nor overly remote in time, and there was little risk of the jury punishing Goodwin for the prior offense given she had already pled guilty to it. (See *Whisenhunt*, 44 Cal.4th at pp. 204-205 [7- to 10-year-old prior offenses less inflammatory and not too remote in time]; *People v. Molano* (2019) 7 Cal.5th 620, 666 [assault against prior wife not unduly inflammatory and jury knew defendant already served time for it].)

Although Goodwin claims the conversation between the court and prosecutor about whether to admit the evidence proves it was impermissibly admitted as propensity evidence, the record indicates otherwise. Indeed, the court expressly instructed the jury not to consider the prior offense as propensity evidence. Moreover, the instruction informed jurors they could consider the evidence for the limited purpose of deciding whether Goodwin acted with the required intent and whether her actions were the result of mistake or accident—and for "no other" purpose. Because we presume jurors "understand and correlate instructions" and "have followed the court's instructions," the jury was unlikely to improperly use the evidence for propensity. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Given this presumption, we similarly conclude it is unlikely the jurors improperly relied on the evidence to establish identity, as Goodwin argues. (See, e.g., *Molano*, 7 Cal.5th at p. 666.)

16

Because the court did not abuse its discretion in admitting the evidence, we need not address prejudice or determine whether Goodwin's due process rights were violated. Nonetheless, to the extent Goodwin claims the limiting instruction given was inadequate, she forfeited this argument by failing to request pinpoint instructions. (*People v. Reed* (1952) 38 Cal.2d 423, 430.)

In sum, we conclude the court did not abuse its discretion in admitting evidence of the 2015 stabbing for the limited purpose of establishing intent and lack of accident or mistake.

B.

Goodwin claims the jury received insufficient evidence of her intent to kill. We disagree.

Murder is the unlawful killing of a person with malice aforethought. (Pen. Code, § 187(a).) Malice can be express or implied. (§ 188(a).) "'Express malice is an intent to kill.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 941.) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*Id.* at p. 942.) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.'" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

When a party challenges the sufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Such evidence can include not only circumstantial evidence, but also all reasonable inferences drawn from it

17

(*People v. Soriano* (2021) 65 Cal.App.5th 278, 286), and "'circumstantial evidence is as sufficient as direct evidence to support a conviction'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055). We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence,'" but we neither reweigh the evidence nor reevaluate the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

According to Goodwin, "absent resort to speculation, the evidence did not support the jury's finding of intent to kill." But as the People note, Rhoades' stab wounds themselves evidence Goodwin's fatal intentions.

"Evidence of intent to kill may be satisfied by proof of a single stab wound that penetrates a vital organ." (*In re M.S.* (2019) 32 Cal.App.5th 1177, 1185.) Rather than stab Rhoades once, Goodwin stabbed her *five times* in the torso, a particularly vulnerable and potentially lethal part of the body. (See *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [abdomen "extremely vulnerable"].) One of those stabs pierced Rhoades' heart. One or more other stabs pierced her bowel and a major vein and artery. These deep and repeated injuries to different parts of Rhoades' front torso and back are sufficient to permit a reasonable jury to infer Goodwin was not simply attempting to ward off Rhoades but rather to fatally injure her.

This inference is bolstered by Aranda's testimony that Goodwin affirmatively sought to arm herself by asking for a knife and Doty's testimony that Goodwin injected herself into the confrontation between him and Rhoades by telling Rhoades to leave him alone. Although Goodwin claims "there was incontrovertible evidence Rhoades was the initial aggressor," a jury reasonably could infer from the evidence that Goodwin armed herself and unnecessarily inserted herself into the melee specifically to use lethal force.

18

Finally, Goodwin ignores the section 1101(b) evidence—addressed above—that the jury could consider as additional evidence of Goodwin's intent.

While Goodwin factually distinguishes cases finding an intent to kill, she notably fails to identify any case in which similar wounds were found insufficient to demonstrate intent to kill. While the authorities the People cite may be factually distinct, they ultimately stand for the proposition that inflicting one or more injuries to a vital area may evidence an intent to kill. (*M.S.*, 32 Cal.App.5th at p. 1185.) Goodwin's contrary arguments fail to persuade.

In short, the record here contains substantial evidence of Goodwin's intent to kill Rhoades.

### C.

Goodwin contends the trial court improperly limited defense counsel's cross-examination of prosecution witnesses and excluded evidence bearing on those witness' credibility by sustaining objections to three of defense counsel's lines of questioning during trial. Goodwin argues that, as a result, the trial court violated her constitutional rights to due process, present a defense, and confront and cross-examine witnesses. We discern no error.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Yet, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.)

Criminal defendants also have a fundamental right to confront adverse witnesses, and "[c]ross-examination is a cornerstone of that" right. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 476.) "Cross-examination cannot serve its critical function unless trial lawyer[s] are given wide latitude in the scope, subject matter and technique of their questioning," especially when "testing the credibility of a witness." (*In re Anthony P.* (1985) 167 Cal.App.3d 502, 507.)

Yet this right does not "'prevent[] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" (*People v. Harris* (1989) 47 Cal.3d 1047, 1091.)

Thus, "[a] trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

1.

Goodwin's first challenge arises from defense counsel's questioning of Simon. Specifically, Simon testified he neither (1) threw away the shirt he was wearing the night of the confrontation nor (2) remembered the shirt having blood on it. Defense counsel then asked, "So if we heard that testimony, it would be untrue; correct?" The court sustained the prosecutor's

20

objection that the question was argumentative. The court did not err in doing so.

First, as a general rule, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744.) Defense counsel sought precisely such improper testimony here: Simon's opinion that any statement by Aranda contradicting his testimony was dishonest.

Second, although Goodwin contends otherwise, the question was argumentative. "'An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer.'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1252.) Defense counsel had already obtained the relevant testimony from Simon about neither having nor throwing away a bloody shirt. Defense counsel did not pose the follow-up question to elicit an answer, but rather to call Simon's credibility into question and highlight for the jury inconsistencies in his and Aranda's accounts. That purpose was achieved the moment the question was asked, regardless of the answer, making it argumentative.

Accordingly, the court did not err in sustaining the prosecutor's objection. Nor did sustaining the objection prevent effective cross-examination of Simon in violation of Goodwin's constitutional rights, as the court did not foreclose further questioning of Simon relevant to his credibility.

Accordingly, Goodwin's claim fails as to Simon's cross-examination.

## 2.

The second challenged exchange occurred during the defense's cross-examination of Aranda:

21

"Q. Do you remember seeing [Simon] with blood on his shirt?

A. Um, no.

Q. Do you remember telling Detective Cortez that you saw [Simon] with blood on his shirt, and he threw away that shirt?

A. Um, I think that was due to him socking the metal.

Q. It's a yes or no question.

[Prosecutor]: Well, Your Honor, the question is argumentative.

[The witness]: Okay. What was the question again?

[The court]: Well, let's—hold on a second.

So I'm going to sustain the previous question, as phrased. You can go ahead and reask and clarify.

[Defense counsel]: That's fine. [¶] . . . Did you see [Simon] throw away the shirt he was wearing that night?

A. Um, no, I didn't see him throw it away, but I did—

Q. It's a yes-or-no question, ma'am. Thank you."

It is unclear on this cold record—from which we cannot discern the volume, tone, or other key characteristics of the question asked—whether the trial court properly sustained the prosecutor's objection here. But even were we to assume the court erroneously sustained the objection, the record belies Goodwin's claim that the court restricted her counsel's cross-examination of Aranda in doing so.

Rather, the court expressly gave defense counsel the opportunity to rephrase his question, to which he responded, "That's fine." Instead of rephrasing the question, however, counsel elected to ask a somewhat different question: whether Aranda witnessed Simon throwing away his shirt rather than if she remembered telling Detective Cortez he did so. Defense counsel then proceeded to pose other questions undermining Aranda's credibility, such as asking Aranda to detail the intoxicating substances she had ingested the night of the incident. Goodwin accordingly fails to establish

22

the court limited her counsel's ability to cross-examine Aranda as to matters bearing on her credibility, much less in an improper or unconstitutional way.

3.

The final exchange Goodwin challenges involved defense counsel's cross-examination of the investigating officer, who testified during direct examination that he found Doty's description of the interaction between Goodwin and Rhoades "suspicious." Defense counsel did not object to the question eliciting that answer on direct.

Later, during cross-examination, defense counsel asked the investigator, "Was it suspicious to you that [Simon] made it a point to say that [Aranda] came out 30 seconds after he saw [Rhoades] stumbling, yet we know by the evidence that she was standing next to him arguing with the people on the other side of the fence?" The court sustained the prosecutor's objection that the question was argumentative.

Defense counsel followed up with, "Did you find it suspicious, this picture here . . . that that big blood splatter was next to [Dopey's car]?" The officer responded in the negative.

Defense counsel next asked, "Did you find it suspicious that [Simon] threw away the shirt that he had on?" The officer said, "We never determined that [Simon] even threw away his shirt."

Defense counsel then asked, "So in your determination that was a false statement by [Aranda]?" The court sustained the prosecutor's objection to that question as argumentative.

The court also sustained the prosecutor's objection to defense counsel's follow-up question—"So do you believe [Aranda] was truthful in making that statement?"—as irrelevant because the jury is to decide witness credibility.

23

As with the question posed to Simon, all these questions sought improper lay opinion testimony regarding the truthfulness of other witnesses or were argumentative. Accordingly, the court did not abuse its discretion in sustaining the objections. Nor did the court foreclose proper cross-examination by doing so. Accordingly, the trial court did not infringe on Goodwin's constitutional rights.

D.

Finally, Goodwin argues the trial court violated her constitutional rights to due process and a fair trial by acceding to the sheriff's decision to put Goodwin in a leg restraint during trial without engaging in an individualized finding of necessity. We agree this was error but conclude it was harmless on this record.

1.

At the last hearing before trial began, defense counsel informed the court Goodwin had a security device attached to her right leg—presumably, as the court put it, to "prevent[ her] from running"—that made it "really hard for her to put pants on." The court asked if the device caused any pain or discomfort, to which Goodwin responded, "It is uncomfortable. It's painful. The Velcro kind of cuts on my legs." The deputy informed the court that "[e]very" in-custody defendant wore that device "when they are dressed out." The court responded that "it sounds like it's more of a sheriff's department policy, I'm reluctant to get involved in." The court then said, "[A]nything visible to the jury, things of that nature, of course, I would make sure to order that they be removed. But something like that, while it does sound like it's at a minimum uncomfortable, I get that there are certain precautions we do need to take in the courtroom that is something from the sheriff's department." It continued, "if there's some other extenuating circumstance,

24

I'd be happy to hear but based on what I understand right now, and from what Ms. Goodwin has indicated, it doesn't sound like something I can have removed." Nonetheless, the court agreed to "do some further inquiry with the sheriff's department."

The first day of trial, the court noted on the record it had looked into whether a different restraint "might be available" "to resolve any discomfort Ms. Goodwin had" but it did "not have a better answer." The court asked if anything else needed to be put on the record, and defense counsel responded, "No."

2.

"A trial court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.) We review the court's decisions on these matters for abuse of discretion. (*Virgil,* 51 Cal.4th at p. 1270.)

Nonetheless, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Id.* at p. 291.) Furthermore, "it is the trial court, not law enforcement personnel, that must make the decision an accused be physically restrained in the courtroom. A trial court abuses its discretion if it abdicates this decisionmaking responsibility to security personnel or law enforcement." (*People v. Hill* (1998) 17 Cal.4th 800, 842.)

3.

As an initial matter, the People incorrectly argue "[t]here is no evidence that the ankle device could or did restrain [Goodwin]'s movement in any way." Rather, the record indicates the device was intended to keep Goodwin from running or escaping. The device thus was not, as the People claim, "a passive monitoring device." It was instead a physical restraint, and *Duran* therefore applies.

Yet the trial court did not "hold a hearing on, or otherwise determine for itself, whether adequate justification existed to physically restrain [Woods] in the courtroom. Instead, the trial court deferred to the sheriff's department's decision that shackles were necessary." (*Hill*, 17 Cal.4th at p. 842.) Accordingly, the court abused its discretion in refusing to remove the leg restraint without first making an individualized determination such restraint was necessary.

That conclusion, however, does not end our inquiry, because we must determine whether the error was prejudicial. "It is settled 'that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in [the defendant's] defense.'" (*People v. Poore* (2022) 13 Cal.5th 266, 288-289.) Because such evidence is lacking here, we conclude wearing the leg restraint did not prejudice Goodwin.

First, the record does not indicate the leg restraint, worn under Goodwin's clothing, was visible to the jury. (See *People v. Govan* (2023) 91 Cal.App.5th 1015, 1026 [defendant not prejudiced by erroneous restraint with lap belt covered by defendant's shirt and table where no indication jury saw].)

26

Second, although Goodwin did not testify in her own defense, the record does not indicate her decision was at all influenced by the wearing of the leg restraint. (See *People v. Cox* (1991) 53 Cal.3d 618, 652.)

Third, while Goodwin claimed on the apparent first day she wore the restraint that it was "uncomfortable" and "painful," she never renewed these claims, even after having an opportunity several days later when the court reraised the issue. (See *Poore*, 13 Cal.5th at pp. 290 [defendant not prejudiced by alleged pain resulting from security chair where defendant presented "no independent verification of his complaints," as "court was not required to accept defendant's uncorroborated declaration at face value"].) Nor is there any indication in the record this alleged discomfort impeded Goodwin's ability to participate in her defense or otherwise consult with her counsel. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 155.)

We find Goodwin's analogy to *People v. Mar* (2002) 28 Cal.4th 1201, in which the defendant was forced to wear a stun belt while testifying, inapt. As the Supreme Court noted in *Mar*, stun belts have "a number of distinct features and risks . . . that properly should be taken into account . . . before compelling a criminal defendant to wear such a device at trial." (*Id.* at pp. 1225-1226.) Such risks and features are not at issue here. Rather, as *Letner and Tobin* explains, "[t]here is no evidence that the leg brace worn by [the defendant] created a remotely comparable level of potential pain, injury, and humiliation, such that [the defendant]'s ability to concentrate and participate in the trial proceedings similarly might have been affected. The sole evidence in the record concerning any possible adverse physical effect of the brace was [the codefendant]'s statement to the trial court that the brace he wore was 'very' uncomfortable." (*Letner and Tobin*, 50 Cal.4th at p. 156.)

27

In sum, we conclude the court's erroneous requirement that Goodwin wear a leg restraint during the trial was harmless, and thus it did not violate Goodwin's constitutional rights.

## III.

We affirm.

CASTILLO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.